

James M. Seedorf
Hughes Bauman Pfiffner
 Gorski & Seedorf, LLC
3900 C Street, Suite 1001
Anchorage, Alaska 99503
(907) 263-8225

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DWIGHT GREENE,

        Plaintiff,

vs.

FEDEX KINKO'S OFFICE AND PRINT
SERVICES, INC.

        Defendant.

Case No. A04-0160 CV (RRB)

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the plaintiff, by and through his counsel of record, HUGHES

BAUMAN PFIFFNER GORSKI & SEEDORF LLC, and opposes defendant's Motion

for Summary Judgment.    Defendant contends that plaintiff cannot prove a prima facie

case against Kinko's that the termination was predicated on discrimination.    Instead,

defendant argues that plaintiff failed to satisfy the employer's "legitimate" expectations

for job performance.  For the reasons stated below, defendant's motion should be denied.

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                      Page 1 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

The evaluations relied upon by Kinko's were the product of the discrimination at issue, and were used as a pretext to terminate plaintiff after the internal complaint has been asserted.

## I.    FACTS

Dwight Greene ("Greene") began his employment with Kinko's in approximately May 1990 as an hourly employee. From the time of his initial hire by Kinko's to January 21, 2004 Greene was an exemplary employee. He received numerous promotions including, but not limited to, being elevated to Shift Leader, Assistant Manager, General Manager, and finally Senior Branch Manager. Letter written by Dwight Greene, June 27, 2003, at 1 (Exhibit 1). Dwight Greene received numerous awards from Kinko's, including but not limited to Store of the Year, 3rd highest Mature Sales Growth, Top Profit Percentage, and 2nd Highest Core Cost Control. *Id.* at 2. In May of 2002, Kinko's congratulated Dwight Greene for "setting a new all-time record at the Northern Lights Kinko's branch." *Id.*

In November 2000 Ron Kuhn ("Kuhn") was designated as Greene's immediate supervisor and with the aid, knowledge and assistance of others, he began a campaign designed to force Greene to resign. Kuhn engaged in a long-term persistent series of unlawful discriminatory acts designed to destroy Greene's status within Kinko's organization and intended to lead to the discharge and/or forced resignation of Greene as a Kinko's employee. The campaign of illegal discrimination included, among other things: repeated threats of termination motivated by Greene's race, religion and age;

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                                                 Page 2 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

negative performance reviews designed to portray Greene in a bad light and create a pretext for termination; mimicking a monkey in reference to Plaintiff at a manager's meeting based on Greene's skin color and/or racial ancestry; efforts to humiliate Greene in front of other Kinko's employees by releasing confidential evaluation materials about him to his peers; preventing Greene from being promoted to Senior Branch Manager and; denying Greene of the appropriate staffing and equipment, thereby ensuring failure. *Id.*

Kinko's learned and knew of the illegal actions because, among other things, Greene informed Kinko's of the conduct via letters sent to, among others, the President of Kinko's, Kuhn's immediate superior, and members of the Human Resources Department. Instead of resolving the issues, however, Kinko's conducted a perfunctory investigation and then actively pursued the termination that supervisor Kuhn had initiated. Specifically, Heather Clark ("Clark") (Kuhn's immediate supervisor) called Greene to ask him "is there anyway you're willing to just drop this and move forward" and agreed to sit down with Greene to discuss the matter once she arrived in Alaska. February 14, 2005 Deposition of Dwight Greene at 255 (Exhibit 2). When Greene declined to "forget" about the issue, Clark moved forward with the termination of Mr. Greene. *Id.* at 256.

## II. STANDARD FOR SUMMARY JUDGMENT

Recognizing that an employee will often be unable to provide direct evidence of discrimination, the United States Supreme Court has employed a three-part pretext analysis test to determine if a supervisor and/or employer acted with discriminatory intent. *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 251 (1981). Under this

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                    Page 3 of 42
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
241221 (8690-1)

analysis the employee carries the initial burden of establishing a prima facie case of racial

or any other type of discrimination. *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792,

(1973)

To establish that Kinko's terminated Greene with intent to discriminate, Greene

must first satisfy the threshold requirement of demonstrating a prima facie case by a

preponderance of the evidence.  Greene must show that: (1) he is a member of a protected

class; (2) he was qualified for the position; (3) he suffered adverse employment action,

despite these qualifications; and (4) the employer treated him less favorably than other

qualified persons. *Douglas v. Anderson,* 656 F.2d 528, 531 (9th Cir. 1981); citing *Texas

Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 251 (1981).  The pretext analysis can

assist the jury in deciding whether the termination was based upon prohibited

discrimination or upon legitimate factors.  *Miller v. Safeway, Inc.,* 102 P.3d 282, 291

(Alaska 2004); citing *Era Aviation, Inc., v. Lindfors*, 17 P.3d 40, 43 (Alaska 2000).

The amount of evidence required to establish a prima facie case of discrimination

is minimal.  *Wallis v. J. R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).  Similarly, very

little direct evidence of discriminatory animus is required to show a pretext and raise a

genuine issue of material fact.  *Coughlin v. American Seafoods Co. LLC*, 413 F.3d 1090,

1095 (9th Cir. 2005).  Moreover, because direct evidence of discrimination is often

unavailable, a plaintiff can establish the existence of a pretext by use of inferences drawn

from the evidence presented.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S.

248, 257 (1981).  The degree of evidence required to raise a genuine issue of material fact

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 4 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

depends on the extent of the inference involved, and may be small where the inference is

small. *Cordova v. State Farm Ins.*, 124 F.3d 1145, 1149 (9th Cir. 1997).

## III   ARGUMENT

### A.   Plaintiff has established a prima facie case of discrimination.

The Alaska Statutes protect employees from unlawful employment practices by

their employers under AS 18.80.220, which provides in pertinent part that:

> (a) Except as provided in (c) of this section, it is unlawful for
> an employer to refuse employment to a person, or to bar a
> person from employment, or to discriminate against a person
> in compensation or in a term, condition, or privilege of
> employment because of the person's race, religion, color, or
> national origin, or because of the person's age, physical or
> mental disability, sex, marital status, changes in marital
> status, pregnancy, or parenthood when the reasonable
> demands of the position do not require distinction on the basis
> of age, physical or mental disability, sex, marital status,
> changes in marital status, pregnancy, or parenthood.

Therefore, if a person feels he has been discriminated against by an employer and

qualifies as a member of one of these classes then he may bring a suit for wrongful

employment practices against his employer.

#### 1.   Racial discrimination

Alaska Statute 18.80.220(a)(1) states, "It is unlawful for an employer to refuse

employment to a person, or to bar a person from employment, or to discriminate against a

person in compensation or in a term, condition, or privilege of employment because of

the person's race, religion, color, or national origin...."   In applying AS 18.80.220(a)(1),

this court has expressly adopted the three-part analytic framework used by federal courts

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                                              Page 5 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

in Title VII cases. *Alaska State Comm'n for Human Rights v. Yellow Cab*, 611 P.2d 487, 488 n. 1, 490 (Alaska 1980).

In *Haroldsen v. Omni Enterprises*, 901 P.2d 426, 430 (Alaska 1995) the superior court stated that in a work-force reduction situation, a prima facie case is established when the employee produces evidence to show "(1) that he is within the protected class, (2) that he was qualified for the job and performing according to the legitimate expectations of the employer, (3) that he was adversely affected by an employment decision, (4) and that others, who are not within the protected class, were treated more favorably."

The defendant gave five business justifications for terminating Haroldsen rather than Taveres: (1) poor work performance; (2) damage to employee morale resulting from Tubbs' favoritism; (3) a reduction in force (RIF); (4) absenteeism and tardiness; and (5) theft. These reasons were all amply supported by affidavits provided by Swanson's. Here, Kinko's reports only one business justification for terminating Mr. Greene and that is poor work performance. Mr. Greene asserts that the alleged poor work performance is a pretext, and that Kinko's and Mr. Kuhn reported low performance scores so as to create the appearance of poor performance.

In *Haroldsen*, the court looked at whether the employer was sincere in stating that performance was the reason for the termination. Id. at 433. The ultimate issue in any employment discrimination case is whether racial animus motivated the employer in making its employment decision. *Id*. Thus, if an employer can show that it subjectively

HUGHES BAUMAN PFEFFER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 6 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

believed it had a legal justification, and that it was acting solely on this belief, an employee's racial discrimination claim must fail. *Id.* If the objective evidence is such that it does not support the stated justification, a reasonable jury could conclude that the party's intent was other than they have testified, and summary judgment would therefore be improper. *Id.* The court concluded that Haroldsen raised an issue of material fact as to whether the employer-stated reasons for terminating his employment were pretextual and ruled that summary judgment was improper. *Id.* at 434.

The same reasoning applies here. There are genuine issues of material fact as to whether the reason for his termination was pretextual. Mr. Greene is an African-American and is recognized as a member of a protected racial class. Mr. Greene's qualifications as an employee of Kinko's are demonstrated by his work history at Kinko's for a total of nearly fourteen years during which he received numerous awards and promotions. Not only was Mr. Greene within a protected class, but he was both qualified for the job and performing according to the legitimate expectations of the employer. Accordingly, steps one and two of the pretext analysis are satisfied.

Beginning in 2002, Mr. Greene underwent a multitude of adverse employment actions ranging from Mr. Kuhn's derogatory remarks, harsh performance evaluations, persistent denials for increased levels of personnel and equipment support, and personal attacks regarding his race, which all ultimately resulted in Mr. Greene's termination.

Mr. Greene expressly complained to Kinko's management regarding the mimicry incident and the prejudice exhibited by Mr. Kuhn in his dealings with Greene. Exhibit 1

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                                    Page 7 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

at 3.    After interviewing Mr. Greene in connection with his complaint, one of the conclusions by Kinko's was that Greene "has never heard Mr. Kuhn make any direct racial comments." May 2005 Expert Witness Report by Dr. Lynne Curry at 8 (Exhibit 3); Kinko's HR Investigation Report and Summary at FK00938 (Exhibit 4).    There is no record in the investigator's report of what Greene actually said during the investigation. Exhibit 3 at 8.    Kinko's conclusion about the "mimicry" incident fails to acknowledge that individuals who don't make racial statements can still treat employees differentially due to racial prejudice.    Exhibit 3 at 8.    For this particular occurrence, Mr. Kuhn's actions speak louder than any words could.

Even more disturbing is the investigator's conclusion that the "monkey mimicry," which Kuhn displayed at a managerial meeting in response to a complaint registered by one of Greene's customers, "was made as part of a light-hearted moment [jovial mood]." Exhibit 3 at 8; Exhibit 4 at FX00942.    This issue was referred to by the investigators as the "inappropriate gesture you referred to" in the letter summarizing the results of the investigation with Mr. Greene.    The investigators steer clear of making any conclusion about the "mimicry" gesture by discussing it only in the context of Greene's co-workers' perception, and never commenting on Greene's perception.

Tracy Gimbel, manager from Kinko's Human Resource department, took part in conducting the investigation, and stated at his deposition that the input from Dwight Greene was that [the monkey mimicry] incident did occur.    Tracy Gimbel Deposition at 66-67 (Exhibit 5).    Mr. Gimbel was also asked if he could "form an opinion as to whether

Hughes Bauman Pfiffner
Gorski & Seedorf, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                                        Page 8 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

it did or did not occur" and he replied, "we [the investigation team] did not know," but added that if it did occur it would have been inappropriate and Mr. Kuhn would have received a "performance counseling or even a special evaluation status." *Id.*

On another occasion, Mr. Kuhn described Mr. Greene as a "slow learner" but "once you get it though, you can run on your own." Exhibit 4 at FK00942; Memo to Dwight Greene from Doris Terrazone and Tracy Gimbel at 1 (Exhibit 6). While the investigators apparently thought the second part of the statement balanced the first part, the "two statements are . . . condescending or patronizing." These stereotypical derogatory comments have racial overtones that are consistent with Mr. Kuhn's pattern of conduct.

Another similar suspect conclusion by the Human Resource Manager and Director was a perfunctory acknowledgement that Mr. Kuhn's act in sending an email containing a negative personal performance evaluation (SES performance status) to other branch managers "… was an accident [or error]." Exhibit 3 at 8; Exhibit 4 at FK00943; Exhibit 6 at 1. Kinko's dismisses the issue as a "mistake" without evaluating it in the broader context of the repeated attacks by Mr. Kuhn against Greene. Exhibit 6 at 67. Despite the fact that Lisa Sagers agreed that Kuhn "acts differently with Dwight [Greene]," nonetheless, Kinko's concludes that Kuhn treated Greene similarly to how he treats other managers. Exhibit 4 at FK00944. Scott Yaskell made similar observations. Deposition of Scott Yaskell at 28-30, 50 (Exhibit 23). Contrary to Kinko's investigation concluding that Mr. Greene was not discriminated against, the foregoing instances reflect the pretext

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                                     Page 9 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

constructed by Kinko's to hide the discriminatory acts against Mr. Greene.    Since

Mr. Greene was treated differently from other employees, his termination in January

2004 satisfies the requirements of parts three and four of the pretext analysis.

### 2.    Religious discrimination

In *Miller v. Safeway*, 103 P.3d 292 (Alaska 2004), the plaintiff contends that

Safeway discriminated against him when it terminated him for expressing his religious

beliefs through his hairstyle.  To assess whether an employee has established a prima

facie case of religious discrimination the Alaska Supreme Court followed the approach

employed by the Ninth Circuit in Title VII cases, as articulated in *Opuku-Boateng v. State*

*of California*, 95 F.3d 1461 (9th Cir. 1990).   This approach requires the plaintiff to

demonstrate that:  (1) he or she has a bona fide religious belief that conflicts with an

employment requirement; (2) he or she informed the employer of this belief; and (3) he

or she suffered an adverse consequence for failing to comply with the conflicting

employment requirement.  *Id*. at 1467, n. 9.  Once these elements have been established,

the burden then shifts to the employer to show that it could not accommodate the

plaintiff's religious beliefs without undue hardship.  *Id*.

Turning to Miller's claim, he did present to the superior court an affidavit in which

he described his long hair as an "expression" of his spirituality and his ties with Alaska

Native tradition.    The trial court correctly acknowledged that Miller met this first

requirement.  Here, Lisa Sagers states in her deposition that,

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                                                Page 10 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

> Dwight [Greene] didn't keep it a secret that he was a minister. Everybody in the store knew that ... so knowing that Ron wasn't [religious] and Dwight was [religious] was, there was a tension there, you know.

Lisa Sagers Deposition at 63 (Exhibit 10). Thus Mr. Greene meets this first requirement.

Miller's claim falters in the second part of the test which requires Miller to have informed his employer about his spiritual beliefs. Because Miller did not give notice to Safeway regarding his religious beliefs or the fact that his hairstyle was tied to his spiritual beliefs, he has not satisfied the second requirement and the court granted of summary judgment on this issue. Here, Mr. Kuhn—Mr. Greene's immediate supervisor—was aware of Mr. Greene's religious affiliations. Thus, Mr. Greene meets the second requirement. Deposition of Ronald Kuhn at 154 (Exhibit 11).

Under the third requirement, Mr. Greene must show that he suffered an adverse consequence for failing to comply with the conflicting employment requirement. His termination by Kinko's satisfies that requirement.

Kinko's repeatedly interfered with Mr. Greene's freedom of religious beliefs and expressions. One mixed instance of racial and religious bias can be seen in the actions of Mr. Kuhn directing plaintiff to remove from his office a photo depicting Martin Luther King speaking at the Lincoln Memorial in Washington D.C. and a poster containing a list of Hebrew names for God from the Old Testament. Responses to Defendant's Second Discovery Requests to Plaintiff, at 6 (Exhibit 7); Dwight Greene Deposition, Volume III at 36-37 (Exhibit 8). Mr. Greene stated that after asking Mr. Kuhn why he was told to

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 11 of 42
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
241221 (8690-1)

remove the picture and poster Mr. Kuhn replied, "because of the religious connotations." Exhibit 8 at 38 and 39. Even though Mr. Kuhn stated that the photo of Martin Luther King presented "religious connotations," plaintiff believes the likely reason is that Mr. Kuhn preferred the photo of Mr. King be removed because the King speech has become symbolic of the Civil Rights movement. Mr. Greene observed that the action came after his relationship with Kuhn had deteriorated and that, "Ron asking me to remove the photo, to remove the poster, was another way of Ron looking to try to frustrate me or irritate me." *Id.* at 39.

Another instance of religious discrimination is reflected in the application of pressure to consume alcohol at internal company meetings. Despite Mr. Kuhn's knowledge that plaintiff was married, and a pastor who did not drink and did not participate in drinking parties, he pressured Mr. Greene to attend a drinking party at Mr. Kuhn's house in Hawaii, participate in a drinking and gambling game in Hawaii, attend a strip club in Fairbanks, and attend other Kinko's events that involved alcohol, swearing or other offensive language. February 9, 2005 Greene Deposition, at 194-196, 198-199 (Exhibit 9). Mr. Greene's belief that he was treated differently from the others because it was against his religious beliefs to take part in drinking, events involving drinking, and going to strip clubs, is supported by his own testimony as well as the testimony of others.

During the course of the retirement party in Fairbanks Mr. Kuhn suggested going to a strip club, and when Mr. Greene responded that he would take a cab back to his

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                        Page 12 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

room, Mr. Kuhn said, "oh, there's Dwight" which put an end to the conversation. *Id.*, at 195-196. Mr. Kuhn had made it appear that Dwight had put a damper on the group's fun. *Id.* at 198. Lisa Sagers, a Kinko's store manager, has stated that Mr. Kuhn had obvious beliefs and opinions as to Mr. Greene's religious beliefs. She stated that Mr. Kuhn "had strong opinions, and he wasn't afraid to voice them." Exhibit 10 at 61. Ms. Sagers also stated that Mr. Kuhn "was pretty outward in kind of letting me know about his beliefs" during the course of the various contacts. *Id.* at 62. Indeed, Ms. Sagers noted that Mr. Kuhn made his non-religious beliefs "kind of obvious in the things he did and the way ... he didn't hide any of that from me." *Id.* She also stated that:

> [Mr. Greene] didn't proselytize to anybody in my presence. I didn't ever hear that he had done that, but since we knew [Mr. Greene] was a minister, you obviously knew what his beliefs are, so knowing that Ron wasn't and Dwight was, there was a tension there, you know.

*Id.* at 63.

Mr. Kuhn interfered with Mr. Greene's ability to express and abide by his religious beliefs and thereby denied Mr. Greene his rights and freedom of religion. These discriminatory actions against Mr. Greene were the real cause for his termination, but have been buried behind Kinko's pretext argument that Mr. Greene was terminated for poor performance.

### 3. Age discrimination

In addition to Alaska statutory protection of unlawful employment practices discriminating against age under AS 18.80.220, the Age Discrimination in Employment

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                    Page 13 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Act of 1967 (ADEA) protects individuals who are 40 years of age or older from employment discrimination based on age. Alaska cases look to the ADEA for guidance and interpretation. *Simpson v. Alaska State Comm'n for Human Rights*, 608 F.2d 1171, 1172 (D. Alaska 1979). The ADEA's protections apply to both employees and job applicants. Under the ADEA, it is unlawful to discriminate against a person because of his/her age with respect to any term, condition, or privilege of employment -- including, but not limited to, hiring, firing, promotion, layoff, compensation, benefits, job assignments, and training.

Mr. Greene began his employment at Kinko's at the age of 33; by the time Kinko's wrongfully terminated him for alleged performance problems Mr. Greene was 47. He was replaced by Ted Collins, who was approximately 34 years old at the time of his promotion. The facts are clear that Mr. Greene qualifies for protection under the Act, and that he was replaced by a younger and less experienced employee. Moreover, there is testimony, from Mr. Greene's own former supervisor, that Kinko's was interested in eliminating more highly compensated employees. When asked why he was wrongfully terrminated, Mr. Kuhn stated:

> I thought that they terminated me to get rid of Dwight and myself ... to get rid of this HR situation that they were involved in. And I also thought that they were looking to get rid of the older – well, not older, but more tenured managers that were – had been with the company a long time, and I was highly paid ... and they got rid of the other district managers as well.

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
241221 (8690-1)

Page 14 of 42

Exhibit 11 at 182. Mr. Kuhn also observed that this was an opportunity for Kinko's to clean house. *Id.*

### 4. Retaliation

Kinko's knew of and even supported the illegal conduct of Ron Kuhn and others, and its investigation of plaintiff's complaint was little more than a pretext for the "planned outcome" referenced by Vice President Charlie Fisher in his internal memo. Charlie Fisher's Internal Memo at 1 (Exhibit 12). The investigator's conclusion ignored the statements by VP Charlie Fisher in his internal memorandum concerning Greene, stating: "we have no case against a retaliation charge because of Ron's actions," and he further suggests to "[c]over him up with data" in order to provide facts to support its course of action. Exhibit 14.

Despite Kinko's knowledge of illegal conduct, it not only permitted unlawful conduct to continue, but also admits to Kuhn's retaliation against Greene, after a series of incidents in July, 2003. *Id.* Starting on July 8, 2003, Kuhn, who was informed of the complaint by Heather Clark soon after it was lodged, approached Greene about the letter. *Id.* When Greene declined to discuss the complaint with him, Kuhn initiated an audit at Greene's branch that resulted in the lowest BOA score that branch has ever received. *Id.* During the course of the audit Kuhn told Greene "you should resign before you are terminated." Exhibit 1 at 1; Exhibit 3 at 3, 9. Kinko's HR representative Tracy Gimbel's understood Mr. Greene's concern to be that Kuhn was saying "irregardless of this BOA, I'm going to terminate you at some point." Exhibit 5 at 91.

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                    Page 15 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

On July 10, 2003, HR Vice President Charlie Fisher wrote to Doris Terrazone (HR representative in charge of the investigation) stating that "the history with Kuhn and Padberg makes a compelling case that Dwight will not, and could not receive fair treatment from Kuhn." Email from Fisher to Terrazone (Exhibit 13), and Exhibit 3 at 3. Mr. Fisher also writes Doris Terrazone on August 5, 2003, stating "we have no case against a retaliation charge because of Ron's actions." Email from Fisher to Terrazone (Exhibit 14); Exhibit 3 at 3. Mr. Fisher later describes in an August 15th email that Ron's actions in going into the branch and evaluating Mr. Greene "can easily be construed as retaliatory." Charlie Fisher Deposition at 55 (Exhibit 15).

At his deposition, Mr. Fisher acknowledged that Gary Kusin—Kinko's Chief Executive Officer —sent to Heather Clark, Diana Ingram, and Mr. Fisher, an email that questioned "how we dropped the ball so badly," and observed that this is "a real violation of our core values." Exhibit 15 at 45-46. Mr. Fisher replies,

> [w]hat Mr. Kusin is stating here is that Mr. Kuhn should not have been told of the letter – specifically. And I think we allude to that through here that we agreed that that was Mr. Greene's request and that was—that shouldn't have happened.

*Id.* at 46-47.

Furthermore, Mr. Fisher agrees that given the facts up to and after the completion of the investigation that, "I believe there could be a perception of retaliation if all of the facts were on the table," … "Ron has clearly put Kinko's at a significant financial risk," … and "managed Dwight in a manner that is inconsistent with our values." *Id.* at 56.

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Page 16 of 42

Despite that knowledge, Kinko's proceeded to terminate Mr. Greene after several delays designed to allow Kinko's to "cover him up with data" supporting the intended action. Exhibit 14.

Other retaliatory actions are illustrated by the scores Mr. Greene received from Mr. Kuhn versus scores he received from other evaluators. For example, scores under other's supervision: February, 2003 Northern Lights branch store, BOA = 91.6%; August, 2003 BEA = 95.1%, September, 2003 BOA = 92.6%. These scores may be compared to those under Ron's supervision: January, 2003 BEA = 73.4%; May, 2003 BEA = 70.6%; July 2003 BOA-69.5%; October, 2003 BEA = 89.9%. Kinko's Assessments (Exhibits 16, 17, 18, 19, 20, 21 and 22); Exhibit 3 at 9. Scott Yaskell, Kinko's Northern Lights Sales Manager, noted that when Mike Gadbery took over for Mr. Kuhn, Mr. Greene's performance evaluations improved. Exhibit 23 at 33. Mr. Greene received a BOA score of 91.6% from Mr. Gadberry at the next evaluation following the 69.5% score he received from Mr. Kuhn.

Other employees at Kinko's expressed in their depositions that Mr. Kuhn treated Mr. Greene differently than he treated other employees. Scott Yaskell, Kinko's sales manager, stated that Mr. Kuhn would inquire about the state of operational issues and customer service at Mr. Greene's store. Exhibit 23 at 28. Mr. Yaskell felt that Mr. Kuhn was out to get Mr. Greene because Mr. Kuhn would discuss Mr. Greene in the presence of Mr. Greene, "in third person, as if Dwight was not there." *Id.* at 29. Moreover, Mr. Yaskell noted that Mr. Kuhn was disrespectful to Mr. Greene because at district

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 17 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

meetings or manager's meetings, Mr. Kuhn would speak to Mr. Greene in a "condescending or disrespectful way, just in the way he spoke to him and his facial expressions and body mannerisms and the inflection in his voice." *Id.* at 29-30. Mr. Yaskell also noted that Mr. Kuhn never discussed or spoke about other store managers, Ted Collins or Lisa Sagers, in the way he spoke about or treated Mr. Greene. *Id.* at 50. Mr. Yaskell also noted that the tension level was much lower during the interim supervision by Mr. Gadberry. *Id.*

Ms. Sagers perceived that there was heightened tension at the meeting where Mr. Greene alleged Mr. Kuhn had engaged in racially motivated mimicry of monkey acts to attack Mr. Greene's character. Exhibit 10 at 67-68. She further states that she "identified this tension [j]ust by, you know, the atmosphere in the room when they were together." *Id* at 68. Ms. Sagers also believed that Mr. Kuhn really liked Ted Collins and "he didn't make any bones about it" and Mr. Kuhn told her all the time "about Ted's performance being really good, which Ted was telling [her] all the time about Dwight's performance being really good." *Id.* at 69. Ms. Sagers found this inconsistency between Mr. Kuhn, Mr. Collins, and Mr. Greene to be "kind of a little telling." *Id.* Indeed, the testimony of these witnesses refutes Kinko's claim that Mr. Kuhn treated all of his managers the same – poorly.

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 18 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)



**B.    Kinko's evaluation process cannot be used to attack competence because the evaluations are subjective, and subject to manipulation.**

Kinko's attempts to justify its action by claiming that Greene failed to meet its expectations, and that its decision to terminate was based on performance standards that Greene failed to achieve.    The documentation, however, lacks the objective characteristics that Kinko's claims it to have.  The evaluations are riddled with subjective items that can be rated in various ways depending on how the evaluator approaches the process.  Moreover, a district manager can affect the performance of his subordinates by providing, or withholding, the needed support that allows for adequate staffing and adequate equipment.  Either, or both, will have an impact on performance over time.  And here, the primary evaluator is none other than Ron Kuhn, the supervisor who is the subject of Mr. Greene's internal discrimination claim.

**1.    Ron Kuhn manipulated the evaluation process by intentionally depriving plaintiff of the tools necessary for success.**

Mr. Greene made repeated efforts to obtain assistance in improving the performance at the Northern Lights branch.  Those efforts focused on both personnel and equipment, and occurred repeatedly throughout both 2002 and 2003.  The requests were largely delayed, and in some cases denied, by Mr. Kuhn.  The lack of quality equipment and the lack of full staffing had a direct impact on the ability of the Northern Lights branch to do the job right, and on time.  "Done right" and "on time" are the key elements at issue in the MSM scoring process, which Mr. Kuhn sought to undermine by keeping

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                  Page 19 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

the Northern Lights branch operating with insufficient personnel and without state of the art equipment.

Mr. Greene states that he requested several pieces of upgraded equipment that would improve operations and enhance the store's ability to get the job done right, and on time. Exhibit 7 at 5. The old equipment had a negative impact on operations because jobs frequently had to be redone, resulting in customer frustration. *Id.* Some jobs had to be farmed out to the Dimond branch, or sometimes even to a local vendor. *Id.* Either way, the poor operating equipment had a huge impact on the store's ability to meet customer expectations. *Id.* Mr. Kuhn denied the request for improvements at the Northern Lights branch, but did provide upgraded equipment to the Dimond branch, despite its lower volume of business. *Id.*

Mr. Greene recalls a conversation wherein Ted Collins of the Dimond branch said that he had simply "asked Ron [Kuhn] for a new computer and it made all the difference in logging in jobs." Exhibit 9 at 78. When Mr. Greene made a similar request to Mr. Kuhn for a computer to reduce time for logging in jobs, Mr. Kuhn replied that it was not in the budget and "I'm not going to get you one." *Id.* Mr. Greene observed that branch efficiency and the corresponding MSM numbers were both negatively impacted by the lack of upgraded equipment. *Id.* at 78-79.

Mr. Greene was also denied the ability to hire new assistant managers, and directed to demote others, thereby limiting his ability to staff operations with qualified personnel for critical operations, and at critical times. Exhibit 7 at 6. In addition,

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                   Page 20 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Mr. Greene requested an increase in the number of assistant managers because of the volume of operations, but was never allowed to hire the personnel needed to fill these positions. These requests for updated or adequate equipment and more personnel were noticed by and supported by other managers at Kinko's.

Scott Yaskell explained how the lack of personnel could affect the performance of an individual branch. Mr. Yaskell also noted that the performance levels for Mr. Greene declined "due to stress and a lot of other factors ... after Ron [came on board]." Exhibit 23 at 32-33. Mr. Yaskell stated that there was, "a lot of stress between the two of them that made it difficult to focus on the task at hand and to be more efficient, run a smoother operation." *Id.* at 33. In the end, Mr. Yaskell perceived the large amount of stress at Mr. Greene's store was because it was "terribly short-staffed." *Id.* at 34. Mr. Yaskell further stated that the effect of being short-staff "creates inefficiencies in the work flow and our business requires that we provide services for our customers that are done right and on time and it affects those criteria." *Id.* Moreover, Mr. Yaskell observed that the lack of adequate staffing at Mr. Greene's store "to run the volume of projects that are going through that branch, the jobs are going to be late and they're not going to be done correctly," thereby affecting the on-time ratings and the done-right ratings at that branch. *Id.* at 58.

Mr. Yaskell was aware that Mr. Greene's branch had actually requested more than one piece of equipment prior to and including 2003. *Id.* at 59. Mr. Yaskell stated that the availability of high speed equipment could contribute to "greater customer satisfaction,"

HUGHES BAUMAN PFIFFNER
GORSKI & SEEBORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Page 21 of 42

on-time ratings, and done-right ratings. *Id.* at 59-60. Lisa Sagers of the Fairbanks branch made similar comments on the importance of having upgraded, faster equipment and their inadequacies affecting MSM scores. Exhibit 10 at 86-87. Ms. Sagers stated that she would not get everything they needed right away, "but eventually [she] was able to get the things [she] needed the most, like color-copying equipment." *Id.* at 87. Ms. Sagers noted that the lack of adequate equipment "absolutely" affects your ability to satisfy customers, on-time ratings, and done-right ratings, all which are key elements in the MSM scoring process. *Id.* Ms. Sagers agreed that the approval of hiring and promotions decisions within the staffing in a particular branch could have a similar affect on MSM scores. *Id.*

There can be no question but that the access to adequate staffing and equipment can have a profound impact on the performance of a branch. That fact is reflected in the testimony of Mr. Greene, Ms. Sagers, and Mr. Yaskell. It is also conceded by both supervisors of Mr. Greene during 2003 – Mike Gadberry and Ron Kuhn. Deposition of Mike Gadberry at 41-42 (Exhibit 26); Exhibit 11 at 226-227. Moreover, these problems both plagued the Northern Lights branch during 2003, as illustrated by the testimony above, and had a predictable impact on the performance of the branch generally, and Mr. Greene in particular.

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 22 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

## 2. Ron Kuhn subjectively evaluated plaintiff in a fashion that was different from other managers.

The investigation performed by Kinko's failed to acknowledge, in the face of factual statements from Mr. Greene and his colleagues, that Mr. Kuhn treated Mr. Greene differently during evaluations from how he treated other managers. Exhibit 23 at 32-34, 58-61; Exhibit 10 at 55-57, 84-85; Exhibit 9 at 78-79; Exhibit 3 at 8. Following the investigation, Kinko's continued to ignore these statements, and to base its analysis of the Greene performance issues on subjective evaluations that were either performed by or with input from the supervisor at issue in the complaint. Indeed, interim supervision by a substitute manager reflected an improvement in scores in the third quarter of 2003, and it was not until after Mr. Kuhn was returned to his supervisory position that Kinko's found the numbers it sought to justify the termination.[1]

Lisa Sagers characterized the methodology for evaluating the branch audits as "not a good tool" and observed that "[t]hey could be easily used to get rid of the manager." Exhibit 10 at 55.    Ms. Sagers recollected Mr. Greene's frustration at receiving poor scores when Mr. Kuhn came by on a day when workers were drilling in his branch and Kuhn decided it was a good time to audit cleanliness in Mr. Greene's store. *Id.* at 55-56.

---

[1] Ratings by Mr. Gadberry during the third quarter of 2003 showed improvement for the Northern Lights branch. In October 2003, Mr. Kuhn's first evaluation after the short interim period was also up from his prior evaluations. However, in November of 2003, Mr. Gadberry once again was called upon to perform an evaluation, and after having dinner in Anchorage with Mr. Kuhn, he rendered a further evaluation which showed deteriorating performance.    Exhibit 26 at 31-37, 95-97.    Kinko's fixes on this "independent" evaluation as a basis for dismissal.

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                        Page 23 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Ms. Sagers stated "that was a deficiency in the audit. They should have made it in a situation where if somebody has a personal problem, they couldn't take it out in the audit like that." *Id.* at 56. She also noted how unfair it was that Mr. Kuhn "would frequently not look at things and just mark that we had them right," yet "be so stringent on someone else's and so lenient on mine." *Id.* Ms. Sagers believed that Mr. Kuhn was motivated to look the other way in her evaluations because if he had given her the correct score it would have made Mr. Greene's score look better. *Id.* Instead, "I felt like [Mr. Kuhn] was being preferential because it made his case against Dwight look better." *Id.* at 57.

Ms. Sagers went on to observe that "[t]there was no one to check on [Mr. Kuhn]. So he really had the power there to do whatever he wanted." *Id.* at 84. She agreed that Mr. Kuhn could rate the manager one way or another, "depending on how he felt." *Id.* at 85. Ms. Sagers also believed that many of the ratings were subjective because there was no way to check on the values, for example, in areas of greeting people or answering the phone before two rings. *Id.*

Mr. Yaskell's testimony reinforces that of Ms. Sagers, and he recalls that "both Dwight and Ted ... made mention to me that they felt some of the ratings were unfair." Exhibit 23 at 60. He agreed that some of the questions in the BOA and the BEA were subjective, e.g., the information put on the job jacket of a customer project by the customer. *Id.* Mr. Yaskell was not subject to evaluations by Kuhn and wasn't sure about manipulating rating results, but did state that "I know that the district managers were directly responsible for grading it." *Id.*

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                        Page 24 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Mr. Yaskell specifically noted that he felt the MSM scores were subjective. *Id.* at 109. He said that "there is a lot – a lot of the data that they use to come up with the MSM score is – is not totally within the branch's control." *Id.* For example, Yaskell stated, "a hiring freeze when you need to have additional staff to service your customers" could cause a branch to suffer from a customer's single experience in relation to the response time, on-site and done-right project preparation. *Id.* at 109-110.

**C.    Kinko's performed a limited investigation of plaintiff's complaints that predictably rejected the discrimination claims.**

Kinko's failed to pursue a thorough investigation by not interviewing coworkers or other individuals who might have relevant information, and/or by ignoring relevant facts whose interpretation should have led to alternative explanations for the conclusions drawn by Kinko's in its report. The Alaska Supreme Court has noted that the failure to address specific issues raised by a dispute can undermine confidence in the result. *Stephens v. ITT/Eelec Services*, 915 P.2d 620, 627 (Alaska, 1996). Here, the investigation by Kinko's failed to determine whether the monkey mimicry incident occurred, but nonetheless, Kinko's chose to assume that there was no discrimination because of the disputed statements on the issue. Instead, it should have expanded its investigation by interviewing others instead of only those who were already subject to the oversight of Mr. Kuhn. Examples of others who were available to be interviewed could have provided a more encompassing set of views and facts such as: Craig Salkeld, Greene's prior supervisor; co-workers who worked for Greene and/or interacted with

Hughes Bauman Pfeffner
Gorski & Seedorf, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                    Page 25 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Kuhn; Steve Padberg, who witnessed interactions between Greene and Kuhn; Scott Yaskell, who was present at various meetings between Kuhn and Greene; and Kuhn's peers. Exhibit 3 at 4-5.

In addition to the lack of interviews, the interviews or statements that were taken were either misinterpreted or completely omitted. None of the interviews were recorded, and no signed statements were taken, leaving reviewers only Kinko's own filtered "facts" as set forth in the summary narratives of the interviews. Exhibit 3 at 7. Indeed, it appears that the conclusion by the investigators that Kuhn treats Greene similarly to how he treats other managers was in direct conflict with the responses of both Dwight Greene and Lisa Sagers, who specifically stated that Kuhn "acts differently with Mr. Greene." *Id.* at 8.

As stated earlier, other colleagues of Mr. Greene agree that Mr. Kuhn treated Mr. Greene differently from other managers. Mr. Yaskell felt that Mr. Kuhn was out to get Mr. Greene, and recalls that Kuhn referred to Mr. Greene in third person even when he was present in the room. He goes on to state that Kuhn would speak to Mr. Greene in a "condescending or disrespectful way, just in the way he spoke to him and his facial expressions and body mannerisms and the inflection in his voice." Exhibit 23 at 29-30. Mr. Yaskell also noted that Mr. Kuhn never discussed or spoke about other store managers, Ted Collins or Lisa Sagers, in the way he spoke about or treated Mr. Greene. *Id.* at 50.

Similarly, and as previously observed, Ms. Sagers perceived that there was heightened tension at the meeting where Mr. Greene alleged Mr. Kuhn had mimicked

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                        Page 26 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

monkey acts, and she "identified this tension [j]ust by, you know, the atmosphere in the room when they were together." Exhibit 10 at 67-68. Ms. Sagers also believed that Mr. Kuhn really liked Ted Collins and that he was in conflict with Greene.

Kinko's Vice President of Human Resources, Charlie Fisher, was concerned that the extremely low score Greene received from Kuhn in the BOA on July 8th reflected retaliation by Kuhn. Exhibit 15 at 55; Exhibit 3 at 9. In fact, scores submitted 5 months before and 2.5 months after Kuhn's retaliatory score are both at least 20 points higher, reaching into the 90 percentile range. *Id.* Kinko's failure to investigate these concerns reflects avoidance of the real issues that led to the harassment and poor work conditions that Greene had repeatedly complained about.

### D.    Kinko's retaliated against plaintiff by knowingly relying on subjective and manipulated evaluations in its decision to terminate plaintiff.

Kinko's appropriately concluded that an investigation was in order when it received Mr. Greene's letter complaining of discrimination by Mr. Kuhn. Unfortunately, it soon lost track of where it was going, exposed Mr. Greene to retaliation by Kuhn during the July 8, 2003 evaluation, failed to conduct a complete investigation, failed to take appropriate action to resolve the issues following the investigation, and failed to meaningfully evaluate Mr. Greene's performance over the succeeding months. The result was a termination that was supported not by facts, but by a goal orientated process that was designed to justify the decision to terminate that Mr. Kuhn had previously initiated.

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 27 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

First, the failure to maintain the confidentiality of the complaint set Mr. Greene up for the precise issue that arose on July 8, 2003. Prior to this evaluation Mr. Greene sent a letter on June 27, 2003 to Gary Kusin, Diana Ingram, and Charlie Fisher seeking to change supervisors, and making allegations about Ron Kuhn. The letter specifically asked that Mr. Kuhn not be allowed to retaliate against Mr. Greene for the complaint. Exhibit 1. In another letter dated July 7, 2003 Mr. Greene sent a follow up complaint similar to the June 27, 2003 letter with the same requests and again, asked that the letter be kept confidential. Exhibit 24. Mr. Kuhn, however, admits that on or about July 1, 2003, Heather Clark called him as soon as she found out that a letter had been sent to Gary Kusin. Exhibit 11 at 253-254. Mr. Kuhn also states that Ms. Clark "might have" told him that the complaint was against him, but he clearly did know that the complaint was about him. Exhibit 11 at 253-254. On July 8, Mr. Kuhn arrived at Mr. Greene's branch, approached Greene about the letter, administered the lowest score ever on a BOA in the history of that branch, and during the course of the audit told Greene "you should resign before you are terminated." Exhibit 1 at 1; Exhibit 3 at 9. Gary Kusin, Kinko's Chief Executive Officer, writes on July 9 "if Ron actually spoke with Dwight about the letter Dwight sent us in confidence, it is unforgivable [sic] and a real violation of our core values." Exhibit 25.

Second, the failure to conduct a thorough investigation left investigators unable to "substantiate" the allegations in the complaint, rendering Kinko's uncertain as to whether the "monkey" incident had or had not occurred. Rather than recognize that the issue was

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                                    Page 28 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

unresolved, Kinko's proceeded to assume that the incident had not occurred, and that conclusion led to a failure to implement any meaningful resolution of the issue. Kinko's remedy was to give Mr. Greene a list of performance expectations with "termination" hinging on the results, while merely giving Mr. Kuhn a "Performance Coaching Statement" that allowed him to pursue his own professional development goals. Dr. Curry observed that the approach to Kuhn was an overly "soft" delivery of constructive feedback and without any disciplinary effect. Exhibit 3 at 10. But neither measure remedied the underlying problem, leaving Mr. Greene exposed to the same abuse as before. *Id.*

Indeed, Kinko's appears to have ignored Mr. Greene's improved performance during a period of interim supervision by Mr. Gadberry during the third quarter of 2003, and began focusing on termination as soon as Mr. Kuhn was back in charge. Exhibit 11 at 296. In fact, Mr. Kuhn admits that Kinko's delayed removing Mr. Greene until he returned to supervise Greene for the purpose of accumulating documentation to support the intended termination, while concurrently promising Kuhn that the situation with Mr. Greene would end soon. *Id.*

Finally, Kinko's based its decision to terminate Greene on a series of a subjective analyses that did not address the reasons for the performance issues (staffing and equipment), and proceeded without attempting to measure the impact of these issues. In fact, Mr. Kuhn admits that the Northern Lights store was understaffed during 2003 and that Mr. Greene did make requests for an assistant manager. *Id.* at 225. Mr. Kuhn also

Hughes Bauman Pfiffner
Gorski & Seedorf, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                                          Page 29 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

admits that a lack of a trained and fully supported staff impacts the branch's overall performance scores through customer service ratings and low moral among the staff. *Id.* at 226. However, Mr. Kuhn stated that after he returned as Mr. Greene's supervisor in mid-October 2003, Human Resources "really wanted [him] to filter issues through Heather." *Id.* at 281. Specifically, requests by Mr. Greene for "hiring assistant managers had to be run through Heather at HR at this point." *Id.* Furthermore, Mr. Kuhn admits that "it was [HR] holding me back" and causing the delays when Mr. Greene kept asking for more staff in his store. *Id.* at 282.

Therefore, the alleged performance problems for which Mr. Greene has been blamed were a direct result of inadequate staffing and substandard equipment, and were the product of upper management level decisions to restrict Greene's ability to address the issues he was confronting. The impact of staffing and equipment problems has been verified by other store managers such as Lisa Sagers and Scott Yaskell, as described above in part III(B)(1) and (2). In addition, Mr. Kuhn admits that performance scores are affected by a lack of staff - the same pre-textual deficiency that Mr. Kuhn and Kinko's imposed on Mr. Greene to create artificially low performance scores.

Ultimately allowing Heather Clark to remain in charge and make the decision whether to terminate Mr. Greene further acerbates the subjective analyses used by Kinko's to terminate Mr. Greene. Ms. Clark's apparent bias against Mr. Greene can be seen in her decision to inform Mr. Kuhn of the complaint against him before any investigation had even been commenced. This bias was also illustrated in Doris

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Page 30 of 42

Terrazone's email to Charlie Fisher stating "it appears Heather [Clark] is siding with Ron [Kuhn]." Exhibit 3 at 3.    Moreover, on August 15 [2003], Charlie Fisher states that Heather needs coaching [and to learn how the law views retaliation], Exhibit 12 at 1; Exhibit 3 at 11. Furthermore, Ms. Clark (Kuhn's immediate supervisor) called Greene to ask him "is there anyway you're willing to just drop this and move forward" and agreed to sit down with Greene to discuss the matter but failed to follow through with such a meeting. Exhibit 2 at 255. Ms. Clark explained the delays in terminating Greene to Mr. Kuhn by stating that, "she believed that Dwight had pulled the race card, that these were the decisions and these were her marching orders, basically, like it or not." Exhibit 11 at 280.    And despite her knowledge of the continuing issues between Kuhn and Greene, Ms. Clark nonetheless directed that the Performance Coaching Statements (SES) be issued to Mr. Greene on August 18, and again on December 12, 2003, this time Ron Kuhn. *Id.* at 285-286.

## IV.    SUMMARY JUDGMENT IS PRECLUDED BY GENUINE ISSUES OF MATERIAL FACT.

### A.    Was Ron Kuhn motivated by racial bias in his evaluation of Dwight Greene?

Defendant claims that there is no evidence of racial bias by Mr. Kuhn, and that no genuine issues of material fact are generated by plaintiff's claim. In so doing, Kinko's ignores the direct testimony of Mr. Greene that Kuhn engaged in monkey mimicry in order to mock and/or humiliate him in the presence of other store managers. Exhibit 6 at FK00949; Exhibit 4 at FK00941-944; Exhibit 3 at 8-11. Lisa Sagers did not see the

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 31 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

mimicry, but noted an increased tension in the room during the course of that meeting. Exhibit 10 at 29-30.

There is also direct testimony that Mr. Kuhn required Dwight Greene to remove a picture of Martin Luther King from his office claiming that it had religious connotations. The picture was not displayed in the common areas of the business, but in Mr. Greene's private office. The order from Kuhn raises questions regarding his motivation, and when taken in the context of the other actions he took, provides evidence of racial bias.

While Kinko's argues there is no direct evidence of racial bias by Mr. Kuhn, his actions clearly demonstrate that he treated Dwight Greene differently, and more harshly, than he treated other district managers. Those differences are reflected in the testimony of Kinko's employees. Scott Yaskell felt that Mr. Kuhn was out to get Mr. Greene because in the presence of Mr. Greene Mr. Kuhn would refer to him "in third person, as if Dwight was not there." Exhibit 23 at 29. Mr. Yaskell stated that Mr. Kuhn was disrespectful to Mr. Greene and spoke to him in a:

> … condescending or disrespectful way, just in the way he spoke to him and his facial expressions and body mannerisms and the inflection in his voice.

*Id.* at 29-30. Ms. Sagers also stated that Mr. Kuhn treated Mr. Greene very different from Ted Collins and that "he didn't make any bones about it." Exhibit 10 at 68-69. She also stated that it was unfair that Mr. Kuhn would give her preferential treatment during the rating process:

HUGHES BAUMAN PFIFFNER
GORSKI & SEEBORG, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                    Page 32 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)



> [Mr. Kuhn] would frequently not look at things and just mark that we had them right, [yet] "be so stringent on someone else's and so lenient on mine ... [Instead], [] I felt like [Mr. Kuhn] was being preferential because it made his case against Dwight look better.

*Id.* at 57.

There is substantial evidence from which a reasonable juror could conclude that Mr. Kuhn was motivated to behave in this manner as a result of racial bias, and that the actions constitute illegal racial discrimination.

> **B.    Was Ron Kuhn motivated by religious bias in his evaluation of Dwight Greene?**

Defendant claims that there is no evidence of religious bias by Mr. Kuhn, and that no genuine issues of material fact are generated by plaintiff's claim.  While Mr. Kuhn denies any religious bias, his actions demonstrate that he focused attention on Dwight Greene at various company activities involving other district managers, and sought to pressure Dwight into actions that he avoided for religious reasons.  Mr. Greene's status as a pastor and his refusal to engage in consumption of alcoholic beverages or attend strip clubs made him a second class member of the group, as is reflected in the testimony of Dwight Greene, Lisa Sagers and others. Exhibit 9 at 194-200 ; Exhibit 10 at 63  Indeed, Ms. Sagers noted that Mr. Kuhn made his non-religious beliefs "kind of obvious in the things he did and the way ... he didn't hide any of that from me." *Id.* at 63.  Mr. Greene describes a similar instance of feeling very uncomfortable when Mr. Greene did not want to take part in a drinking game and the following scenario:

HUGHES BAUMAN PFIFFNER
GORSKI & SEEBORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Page 33 of 42

> Ron said, come on, Dwight; you can do this. And I said, no, I
> don't want to play this game. Steve said, well, then at least
> put money in the pot. And I said, I'm not playing this game.
> Two other people, Carl Greer and Scott Yaskell, had to speak
> up and say, leave him alone, he doesn't play this game; just
> go to the next person.

Exhibit 9 at 198-200.

Similarly, at a retirement party in Fairbanks Mr. Kuhn suggested going to a strip club, Mr. Greene responded that he would take a cab back to his room and Mr. Kuhn said, "oh, there's Dwight" which put an end to the conversation. Exhibit 9 at 195-196. Mr. Kuhn was well aware of Dwight's belief. Exhibit 11 at 154.

At the office, Mr. Kuhn's discriminatory acts forced Mr. Greene to remove a Martin Luther King photo--generated from a United States Postal Service stamp distribution--from behind his desk and a poster listing the names for God in Hebrew. In response to his inquiry, Mr. Greene was told that it was: "because of religious connotations." Exhibit 8 at 37-38.

There is substantial evidence from which a reasonable juror could conclude that Mr. Kuhn was motivated to behave in this manner as a result of religious bias, and that the actions constitute illegal racial discrimination.

## C. Did Kinko's use its evaluation process as a pretext to terminate Dwight Greene in retaliation for his complaints about Ron Kuhn?

Defendant claims that it terminated Mr. Greene for performance related issues, and not in retaliation for his complaints of discrimination. However, as discussed above in section III(B)(1) and (2), the evaluation process can be and was manipulated to provide

HUGHES BAUMAN PFEFFER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 34 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

support for the ultimate termination of Mr. Greene. Manipulation can, on the surface, be

seen in the contrast between the scores recorded when Mr. Kuhn performed the

evaluations and when they were performed by others, such as Mr. Gadberry in the third

quarter of 2003. Below the surface, they are reflected in the restraints placed on

Mr. Greene's ability to control the branch performance and upgrade its facilities.

Mr. Yaskell noted that the performance evaluations for Mr. Greene declined:

> due to stress and a lot of other factors ... after Ron [came on
> board] [and there was] a lot of stress between the two of them
> that made it difficult to focus on the task at hand and to be
> more efficient, run a smoother operation.

Exhibit 23 at 32-33. Mr. Yaskell also stated that the effect of being short-staff:

> creates inefficiencies in the work flow and our business
> requires that we provide services for our customers that are
> done right and on time and it affects those criteria.

*Id.* at 34.

Ms. Sagers commented on the importance of having upgraded, faster equipment

and their inadequacies affecting MSM scores. Exhibit 10 at 86-87. Ms. Sagers noted that

the lack of adequate equipment "absolutely" affects your ability to satisfy customers, on-

time ratings, and done-right ratings, all which are key elements in the MSM score

process. *Id.*

Finally, upper management realized after the first obvious instance where

Mr. Kuhn gave Mr. Greene a low score in the BOA that Mr. Kuhn was operating outside

of the stated policy. Gary Kusin, Kinko's Chief Executive Officer, writes on July 9th "if

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                          Page 35 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Ron actually spoke with Dwight about the letter Dwight sent us in confidence, it is unforgiveable [sic] and a real violation of our core values." Exhibit 25.   Furthermore, Mr. Fisher agrees that given the facts up to and after the completion of the investigation that:

> I believe there could be a perception of retaliation if all of the facts were on the table, … Ron has clearly put Kinko's at a significant financial risk, … and managed Dwight in a manner that is inconsistent with our values.

Exhibit 15 at 56.

### D.    Was Dwight Greene qualified to be a branch manager at Kinko's?

Kinko's claims that the evaluations performed by Mr. Kuhn demonstrate that Dwight Greene was not qualified to be a branch manager.  As discussed above in section III(A)(4) and III(B)(1) and (2), those evaluations were manipulated to achieve Kinko's desired results, and do not reflect the qualifications or abilities of Mr. Greene.  Indeed, those abilities have been recognized by the President of Kinko's himself, Gary Kusin, in the commendations issued to Dwight for outstanding performance. Exhibit 11 at 35-36.

Mr. Greene has also received numerous other awards since he began his employment with Kinko's in approximately May 1990 as an hourly employee. Exhibit 1 at 1.  Dwight Greene received numerous awards from Kinko's, including but not limited to Store of the Year, 3rd highest Mature Sales Growth, Top Profit Percentage, and 2nd Highest Core Cost Control. *Id.* at 2.  In May of 2002, Kinko's congratulated Dwight Greene for "setting a new all-time record at the Northern Lights Kinko's branch. *Id.*

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 36 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Most recently, two weeks before Mr. Greene was issued a Performance Coaching Statement, August 18, 2003, Mr. Kuhn confirmed that on August 5, 2003, Mr. Greene received a letter from Rick Jensen commending Mr. Greene for his performance in handling the BP contract. Exhibit 11 at 230-231. The letter characterizes Mr. Greene's performance as:

> the relationship in Alaska is considered a Best In Class relationship when compared to other BP/Kinko's relationships.

*Id.* at 231. Mr. Kuhn further confirms that this was a successful effort to improve sales and add customers in 2003. *Id.* There is no question but that Dwight was quite capable of managing the Northern Lights branch.

**E.    Did Dwight Greene perform adequately as a branch manager at Kinko's?**

Kinko's claims that the evaluations performed by Mr. Kuhn demonstrate that Dwight Greene was not performing to Kinko's standards. As discussed above in section III(B)(1) and (2), those evaluations have been manipulated to achieve Kinko's desired results, and do not reflect the actual performance nor the abilities of Mr. Greene.

Both Scott Yaskell and Lisa Sagers testified that Mr. Greene was a very qualified manager to whom they often turned for advice. Mr. Yaskell stated:

> Overall I thought he was a great branch manager … Dwight and I worked exceptionally well together. We had a good—a great team, we had experienced team members that had passion and willingness to succeed, and we had good relationships with our customers.

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)                                                                    Page 37 of 42

Exhibit 23 at 32, 36.  Lisa Sagers stated that:

> I would call him to ask questions, so my opinion of his
> performance and his competence was pretty high.  And I kind
> of envied him, the feeling that he had in his store, because I
> didn't have that in my store … I was constantly trying to
> figure out how I could get that kind of atmosphere in my store
> … His customers loved him.

Exhibit 10 at 69-70.   The use of subjective evaluations - performed by the very person

who made it clear that he would replace Dwight – does not provide a basis to challenge

the performance of Mr. Greene.

### F.    Did Kinko's adequately investigate Dwight Greene's complaints?

The adequacy of Kinko's investigation has been discussed above in section III(C).

The failure to perform a full investigation led naturally to the conclusion that no

discrimination had occurred.  Indeed, Doris Terrazone, the head HR person involved in

the investigation, has never conducted a racial investigation that didn't end up finding in

support of the employer.  The inadequacies in the investigation are seen more clearly in

the actions of Mr. Kuhn than they are in his statements.  In this context, it is worth

remembering the testimony of Mr. Greene about Mr. Kuhn forcing him to remove his

Martin Luther King photo and a Hebrew poster from his office.  Exhibit 8 at 37-38.  A

more thorough investigation by HR would have asked more revealing questions and

looked for other potential acts of discrimination, rather than simply relying on a cursory

question asking interviewees if they ever heard Mr. Kuhn make any direct racial

comments. Exhibit 4 at FK00938; Exhibit 3 at 8.

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                                Page 38 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

The failure by HR to record or obtain signed testimony from the interviews leaves only the employer's summaries as support for its investigative conclusions. Exhibit 3 at 8. In fact, copies of emails that passed between HR and upper management indicate both Vice President Charlie Fisher and Chief Executive Officer Gary Kusin were very much aware of the actions of Mr. Kuhn.  On July 10, 2003, HR Vice President Charlie Fisher acknowledged to Doris Terrazone (HR representative in charge of the investigation) that "the history with Kuhn and Padberg makes a compelling case that Dwight will not, and could not receive fair treatment from Kuhn." Exhibit 13 and Exhibit 3 at 3.  The approach suggested by Fisher was "to cover him up with data" in order to achieve the "planned outcome," and that is precisely what the HR staff did.

### G.    Did Kinko's discriminate against Dwight Greene because of his age?

Kinko's maintains that no age discrimination has occurred, and yet it is clear that Mr. Greene was replaced with a younger employer at a lower level of compensation. Intended or not, the appointment of Ted Collins as the new Northern Lights branch manager generates *de facto* age discrimination because of his youth as opposed to Mr. Greene's age.

### H.    Did Ron Kuhn treat Dwight differently from other branch managers?

Kinko's maintains that its investigation showed that Ron Kuhn was an abusive manager who treated all of his subordinates in a heavy handed and confrontational manner.  Yet the other people in regular contact with Mr. Greene and Mr. Kuhn saw the differences in treatment.

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                          Page 39 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Scott Yaskell stated that Mr. Kuhn would ask questions about the state of operational issues and customer service at Mr. Greene's store. Exhibit 23 at 28. Mr. Yaskell also stated that Mr. Kuhn would speak to Mr. Greene in a "condescending or disrespectful way, just in the way he spoke to him and his facial expressions and body mannerisms and the inflection in his voice." *Id.* at 29-30. Furthermore, Mr. Yaskell stated that Mr. Kuhn never discussed or spoke about other store managers, Ted Collins or Lisa Sagers, in the way he spoke about or treated Mr. Greene. *Id.* at 50.

Ms. Sagers stated that Mr. Kuhn really liked Ted Collins. Exhibit 10 at 69. In fact, Ms. Sagers noted that this scenario between Mr. Kuhn, Mr. Collins, and Mr. Greene was "a little telling." *Id.* While the testimony demonstrates that Mr. Kuhn treated Mr. Greene poorly, he was capable of treating other managers in a friendlier and less hostile manner. There is direct testimony of differential treatment of employees from those directly affected, and a reasonable jury could conclude that Dwight was treated differently from the other Alaska managers.

## V. CONCLUSION

Defendant's motion for summary judgment must be denied because it fails to satisfy the criteria for summary judgment. Defendant is not entitled to judgment as a matter of law because it has not followed the legal requirements for prompt and thorough investigation of discrimination complaints, because Mr. Kuhn engaged in numerous acts of discrimination against Mr. Greene, and because it retaliated against Mr. Greene after he made his discrimination complaint.

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                    Page 40 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Moreover, there are numerous genuine issues of material fact, as outlined above, that can only be resolved by a jury after full consideration of all of the facts and testimony to be provided at trial. Plaintiff has provided direct evidence of discriminatory animus in the form of the "monkey mimicry" incident and the Martin Luther King photo incident, meeting the minimal requirements for establishing a genuine issue of material fact. Little or no inference is required to establish animus from those events, but plaintiff has nonetheless provided substantial and specific evidence of discrimination and retaliation sufficient to create genuine issues of material fact even under a more rigid standard.

DATED at Anchorage, Alaska this 28th day of December, 2005.

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF LLC
Attorneys for Plaintiff

By: _____
     James M. Seedorf
     ABA No. 7710164

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*                                              Page 41 of 42
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy
of the foregoing was ☐ faxed ☐ hand
delivered and/or ☒ mailed this 28th day of
December 2005 to:

Thomas M. Daniel, Esq.
Perkins Coie LLP
1029 W. 3rd Avenue, Suite 300
Anchorage, Alaska 99501

_____
Michelle Martin

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Opposition to Motion for Summary Judgment*
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
241221 (8690-1)

Page 42 of 42

## LIST OF EXHIBITS

### PLAINTIFF'S OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.  6/27/03 letter from Dwight Greene to Gary Kusin **(Filed Under Seal)**
2.  2/14/05 Deposition of Dwight Greene (Vol. II)
3.  May 2005 Expert Witness Report by Dr. Lynne Curry
4.  Kinko's HR Investigation Report and Summary
5.  Tracy Gimbel Deposition
6.  Memo to Dwight Greene from Doris Terrazone and Tracy Gimbel
7.  Plaintiff's Responses to Defendant's Second Discovery Requests
8.  9/22/05 Deposition of Dwight Greene (Vol. III)
9.  2/9/05 Deposition of Dwight Greene (Vol. I)
10. Deposition of Lisa Sagers
11. Deposition of Ron Kuhn
12. Charlie Fisher's Internal Email Memo dated August 15, 2003 **(Filed Under Seal)**
13. July 10, 2003 email from Charlie Fisher to Doris Terrazone **(Filed Under Seal)**
14. August 5, 2003 and July 31, 2003 emails between Doris Terrazone and Charlie Fisher **(Filed Under Seal)**
15. Deposition of Charlie Fisher
16. March 19, 2003 Branch Operations Assessment **(Filed Under Seal)**
17. August 28, 2003 Branch Executive Assessment **(Filed Under Seal)**
18. September 23, 2003 Branch Operations Assessment **(Filed Under Seal)**
19. October 13&14, 2003 Branch Executive Assessment **(Filed Under Seal)**
20. January 28, 2003 District Manager Checklist **(Filed Under Seal)**
21. May 19, 2003 Branch Executive Assessment **(Filed Under Seal)**
22. July 8, 2003 Branch Operations Assessment **(Filed Under Seal)**
23. Deposition of Scott Yaskell
24. Dwight Greene 7/7/03 letter to Kinko's **(Filed Under Seal)**
25. Gary Kusin 7/9/03 email to Heather Clark **(Filed Under Seal)**
26. Deposition of Mike Gadberry

HUGHES BAUMAN PFEFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX