**<u>LIST OF EXHIBITS</u>**

**<u>PLAINTIFF'S SUPPLEMENTATION OF THE RECORD IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

A.    Deposition of Ted Collins, pages 86 through 133.

B.    Affidavit of Cheri Perez

C.    Affidavit of Joe Poydack

D.    Affidavit of Holly Poydack

E.    Affidavit of Sheila Hudman

F.    Affidavit of Dave Groh

G.    Affidavit of Chris Kinney

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

DWIGHT GREENE,

          Plaintiff,

     vs.        Case No. A04-0160 CV (RRB)

FEDEX KINKO'S OFFICE
AND PRINT SERVICES, INC.,

          Defendant.


     VIDEOTAPED DEPOSITION OF THEODORE R. COLLINS
                  April 7, 2006
                   9:01 a.m.
              Bean & Associates, Inc.
        119 East Marcy Street, Suite 110
           Santa Fe, New Mexico  87501


          PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  MR. JAMES M. SEEDORF
           Attorney for the Plaintiff


REPORTED BY:  Jan A. Williams, RPR, CCR 14
              Bean & Associates, Inc.
              Professional Court Reporting Service
              500 Marquette, Northwest, Suite 280
              Albuquerque, New Mexico  87102

     (571A)  JAW

EXHIBIT A
Page 1 of 13

BEAN & ASSOCIATES, INC.
info@litsupport.com   500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102      505-843-9494
52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

Page 86

1    A.   Tardiness, I wasn't showing up to work at --
2  I think his time was 8:30 a.m.  And I was showing up
3  for work at ten approximately.
4    Q.   And do you know how Ron Kuhn found out about
5  that?
6    A.   I have no idea.
7    Q.   What did he say to you about it?
8    A.   He said are you coming in at 8:30 or later.
9  And I said I'm coming in later.  He says, well, I want
10 you to start coming in at 8:30, you have to be here at
11 8:30 or, you know, we're going to have to do a
12 write-up on this.  And I said all right.
13       And then he would call at random times always
14 in the morning to make sure that I was there at 8:30
15 for the next -- I don't know how long he continued
16 that, I can't remember.
17   Q.   And, other than that one time that he got
18 onto you about, was that ever an issue again?
19   A.   No.
20   Q.   Did you start coming in at 8:30?
21   A.   Yes.
22   Q.   Do you recall about what time Ron Kuhn gone
23 onto you about the time that you were coming to work?
24   A.   I don't recall.
25   Q.   In terms of Ron's tenure, was it more toward

Page 87

1  the beginning, middle, or end?
2    A.   I think it was closer to the end.
3    Q.   And to your knowledge was Ron Kuhn aware that
4  you were coming in after 8:30 before he brought it to
5  your attention?
6    A.   I had no idea.  I thought that -- I actually
7  kind of was of the belief that a manager, as long as
8  he took care of business, should be able to set his
9  own hours.  And that was my one deviation from
10 corporate policy.  And I got nailed on it.
11   Q.   Did Ron ever complain to you about not
12 responding promptly enough to something called KBMXs?
13   A.   Yes.
14   Q.   What are KBMXs?
15   A.   They're voice mails.  You know, you check
16 your boss' voice mail once or twice a day and respond
17 to whatever requests or action items he has laid out
18 for you.  There were times where I went fishing.
19       And this is actually another time that -- you
20 know, I didn't recall this until now.  That I took Ron
21 fishing and I took T. Scott fishing, I took a bunch of
22 corporate people fishing.
23       And anyways, after the fishing trip, I got
24 back into town.  And he left a voice mail for me
25 saying that he had not received my payroll numbers yet

Page 88

1  and he needs my payroll numbers.  And I was a little
2  upset because it's like, well, I was just fishing with
3  you.
4        So anyways he was very -- I mean, if I forgot
5  to leave him a message on anything, even if I had just
6  taken him fishing, he would get me on it, he would
7  remind me.  So he was very particular about the voice
8  mails and staying tuned in.  And I think he was doubly
9  certain about staying focused on that when he had two
10 or three branches in Alaska that he couldn't keep an
11 eye on that closely.
12   Q.   Do you recall Ron Kuhn ever saying anything
13 to you about your MSM scores?
14   A.   Saying to me about my MSM scores?
15   Q.   Yes.
16   A.   When I first took over the Diamond branch,
17 our MSM scores weren't too good nor were the core
18 costs or anything.  I was still trying to -- I was
19 still green around the ears and trying to figure out
20 what I was doing.  And he at district meetings would
21 bring up data forms that would say which branch was
22 doing good in what area and MSM scores and all that.
23       And Diamond branch was pretty much at the
24 bottom of the list on a lot of those issues.  So he
25 talked with me about it and it affected my first

Page 89

1  performance appraisal with him, because he would have
2  a section on the hard facts and then a subjective
3  section on what you thought you could be using to
4  develop yourself on.  And I didn't do very well on
5  that first one because our MSM scores were low and our
6  other scores were low as well.
7    Q.   And, when you say low, do you recall where
8  they were?
9    A.   I don't recall.  I know that -- eighties is
10 what -- is what I kind of remember as eighties MSM
11 score.  And we were below the company standard which
12 was I think at the time 90 percent.
13   Q.   And, in response to that criticism by Ron
14 Kuhn, did you improve your MSM scores?
15   A.   Yes, we improved our MSM scores.  And I'm not
16 so certain it was just through time and the work we
17 put into the branch or, you know, not necessarily his
18 comments had any effect on that.  I think it was just
19 the work that we started doing there at the Diamond
20 branch.
21   Q.   And, by the time you left the Diamond branch,
22 were your scores in the nineties?
23   A.   Yes.
24   Q.   And what did you do to improve your MSM
25 scores?

23  (Pages 86 to 89)

BEAN & ASSOCIATES, INC.
info@litsupport.com    500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102    505-843-9494
52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

Page 90

1    A.  Laid out a simple outline for the team
2  members to follow, you know, their job descriptions;
3  tried to create a lot of stability in the workday and
4  not so much fly by the seat of your pants so that, you
5  know, certain people were always doing the Jet-Lite
6  and certain people were always running jobs and, you
7  know, if someone else needed to fill in, they could in
8  another position.
9       But I cleaned up the store myself and
10 organized it and got rid of a lot of stuff that we
11 didn't need anymore.  All these changes I think
12 created an environment where the team members felt
13 that it was a little bit less stressful.
14      And the customer, because of the low
15 turnover, started to recognize the same faces all the
16 time.  And they had -- we had a lot of repeat
17 business.  We made some sales strategies back then
18 that Kinko's was pushing for, having account managers
19 and whatnot that had an impact as well.
20      But, by the time they started making a splash
21 with the local clientele, our operations were pretty
22 solid and we were able to service those jobs and those
23 customers on time and done right.  And that helped our
24 MSM scores.  That is what -- that is where it raised.
25   Q.  You testified that you didn't have any

Page 91

1  equipment problems at the Diamond store; is that
2  right?
3    A.  Correct.
4    Q.  Were you aware of any equipment problems at
5  the Northern Lights store?
6    A.  Yes.
7    Q.  What were they?
8    A.  Based on the volume of the sales they did and
9  certain jobs they were taking care of, they didn't
10 have the right color equipment to run the color volume
11 that they had.  And they never were able to get the
12 specific machine they were looking for to handle the
13 high volume of color that they do.
14      They were able to get another high volume
15 black and white machine which I know -- that happened
16 later on in Dwight's career there at the Northern
17 Lights branch.  But the color one is the one that
18 stands out the most in my mind, they just were not
19 able to get the machine they wanted.
20   Q.  And, by the machine they wanted, you mean one
21 that would process more color copies?
22   A.  Yes.
23   Q.  Okay.  And what was the problem with getting
24 the right color equipment as you put it?
25   A.  According to Dwight Ron didn't want to do it

Page 92

1  because all of his stores have a specific machine
2  called the Doc 12.  And Ron, instead of getting this
3  machine that would be different from the rest of the
4  stores for Dwight, decided that he would just get him
5  more of the same machine that the other stores had.
6       I'm not sure -- I'm sure there's some
7  business in there that I wasn't told about from Ron's
8  point of view that, you know, they had a contract with
9  these machines, they bot a better deal with them, it's
10 cheaper.  I'm sure all of that factored into his
11 decision, but I don't know for certain.
12   Q.  And so, if I'm understanding you correctly,
13 Ron did approve two color copiers but Dwight wanted
14 one that was bigger and faster?
15   A.  Yeah, to the best of my knowledge, that's
16 what I've been told from Dwight.
17   Q.  Okay.  And do you recall what time frame that
18 occurred?
19   A.  That was early on, that was about the time
20 that Scott Yaskell had -- it was about the first -- I
21 think it was the first year that Dwight took over the
22 Northern Lights branch.  Scott Yaskell had a huge
23 account, McKinley Capital or something like that, that
24 had a lot of color copies.
25      And they were having a heck of a time trying

Page 93

1  to get them done on these little office copiers.  So
2  he was pleading with Ron to try to get this big
3  machine.  And Ron just didn't want to have it, didn't
4  want to deal with it.
5    Q.  And, after they got the two -- I think you
6  called them Doc 12s?
7    A.  Yes.
8    Q.  Did that solve the problem?
9    A.  I don't know.  Dwight always complained about
10 those machines.  I think he always wanted the one
11 machine.
12      THE VIDEOGRAPHER:  I've got five minutes on
13 this tape, sir.
14      MR. DANIEL:  Okay.  Just let me know when you
15 want me to stop.
16      THE VIDEOGRAPHER:  Okay.  Thank you.
17 BY MR. DANIEL:
18   Q.  Do you have any knowledge of Ron Kuhn telling
19 Dwight Greene to remove a picture of Martin Luther
20 King and a poster containing the names of God on it in
21 different languages from his office wall?
22   A.  The part of that story I remember is that
23 Steve Padberg told Ron to tell Dwight to take those
24 down when Steve Padberg made a visit.  And that was
25 Ron's boss at the time.  That was -- I don't remember

24 (Pages 90 to 93)

BEAN & ASSOCIATES, INC.
info@litsupport.com   500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102   505-843-9494
52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

Page 94

1  when that was, though.
2      Q.  Was that early in Ron's tenure or late in his
3  tenure?
4      A.  I think it was -- I think it was in the
5  middle.
6      Q.  Okay.  And who did you hear that from?
7      A.  I think it was from Dwight.
8      Q.  And did Dwight tell you what Padberg said or
9  what Ron Kuhn said about the pictures?
10     A.  No, not so much.  I think he just said that
11  he was told to take them down and isn't that
12  ridiculous or something along those lines.
13     Q.  And did Dwight tell you what reason they gave
14  for telling him to take the pictures down?
15     A.  That it was -- I don't know if anyone told me
16  a reason.  As far as my own opinion is that it just
17  wasn't representing Kinko's.  You know, Kinko's is
18  supposed to be a neutral zone.
19         And they were -- and Dwight was putting up
20  images that could offend certain people.  I mean it's
21  hard to believe that Martin Luther King could offend
22  anybody, but, you know, who knows.  It was not Kinko's
23  stance, therefore, it shouldn't be in the office
24  place.
25         MR. DANIEL:  This is a good time to stop.

Page 95

1         THE VIDEOGRAPHER:  Okay.  Excuse me.  The
2  time is 11:41.  Thank you.
3         (Discussion off the record.)
4         THE VIDEOGRAPHER:  Thank you.  We're back on
5  the record.  The time is 11:42.
6  BY MR. DANIEL:
7      Q.  Do you remember a sales rep at FedEx Kinko's
8  named Karen Bell-Hoover?
9      A.  Yes.
10     Q.  And what do you remember about her?
11     A.  She was -- I had lost my account manager,
12  Julie Buse.  And Dwight had Scott Yaskell.  And Karen
13  Bell-Hoover was hired as an account manager that was
14  entrusted to me by Ron because he thought that she
15  would have a better training under -- at my store than
16  at Dwight's store.  And I think she was hired to
17  represent both stores but was trained at my store.
18     Q.  And then which store did she end up working
19  out of?
20     A.  My store.
21     Q.  And did she do sales for both stores or just
22  your store?
23     A.  For both stores.
24     Q.  And did Dwight Greene ever complain to you
25  about Karen Bell-Hoover being placed in your store?

Page 96

1      A.  He was upset about that because Ron had her
2  reporting to me.  And at the time he was considered
3  the hub manager and it made no sense for her to report
4  to me versus him.  And I totally agreed with him.  I
5  said I don't know why she's, you know, under my care.
6      Q.  And did you ask Ron about that?
7      A.  Yes.  And that's when he told me that he
8  thought that she would flourish in my system over
9  Dwight's system.
10     Q.  Did you agree with that?
11     A.  No.
12     Q.  Why not?
13     A.  Because I didn't have Scott Yaskell at my
14  store.  Sure, we had operations running smooth and we
15  could handle just with any job thrown at us.  But I
16  didn't want the care of a salesperson.
17         I thought it was Kinko's latest fad, trying a
18  new position to see if it works, and I didn't think it
19  was going to last very long and I just wasn't behind
20  it.  It was just more responsibility than I wanted to
21  deal with at that time.
22     Q.  But you had had a sales rep at your store
23  before Karen Bell-Hoover?
24     A.  Yes.
25     Q.  But you still thought she should have been

Page 97

1  placed at Northern Lights instead of --
2      A.  If she was going to represent both stores and
3  bring sales to both stores, then in my opinion having
4  her placed at my store was a nice gesture on Ron's
5  behalf since he knew that we didn't have a salesperson
6  there and it would try to help generate sales for the
7  Diamond branch and keep our morale up.  But personally
8  I didn't want to -- I didn't want to deal with the
9  added role and responsibility of being a sales
10  counselor.
11     Q.  Did Karen Bell-Hoover ever say anything to
12  you about the Northern Lights branch?
13     A.  She said that her jobs are always getting
14  screwed up over there and late and messed up and
15  whatnot.  But she also complained about me to Dwight
16  and said that I wasn't -- I was cold and detached and
17  she had trouble talking to me.
18         So I'm not -- you know, she had a lot of
19  stories to tell.  And I admit I was -- I wasn't real
20  supportive of her position.  But she complained about
21  the jobs at Northern Lights, yet did not bring
22  anything over to the Diamond branch and trying to fix
23  that stuff.  She ended up spending more time over
24  there at Northern Lights than at the Diamond branch
25  even though she was based out of our store.

25  (Pages 94 to 97)

BEAN & ASSOCIATES, INC.
info@litsupport.com      500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102      505-843-9494
52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

Page 98

1    MR. DANIEL: Could we go off the record just
2  a moment.
3    THE VIDEOGRAPHER: Thank you very much.
4  We're going off the record. The time, excuse me, is
5  11:47.
6    (Recess.)
7    THE VIDEOGRAPHER: Thank you. We're back on
8  the record. The time is 11:50. Thank you.
9  BY MR. DANIEL:
10   Q. Do you think Dwight Greene was prevented from
11  succeeding because of things that Ron Kuhn did?
12   MR. SEEDORF: Objection, speculation.
13   THE WITNESS: I don't know.
14  BY MR. DANIEL:
15   Q. Do you think that Ron Kuhn discriminated
16  against Dwight Greene because of Dwight's race?
17   A. No.
18   Q. Do you think Ron Kuhn discriminated against
19  Dwight Greene because of his age?
20   A. No.
21   Q. Do you think Ron Kuhn discriminated against
22  Dwight Greene because of his religion?
23   A. No.
24   MR. DANIEL: I have no further questions.
25   MR. SEEDORF: I do have a few.

Page 99

1    MR. DANIEL: Do you want to switch back over
2  here?
3    MR. SEEDORF: I suppose, otherwise you're
4  going to be looking at me over here.
5    THE VIDEOGRAPHER: I'll go off the record
6  real quickly. Thank you. We're going off the record.
7  The time is 11:51. Thank you very much.
8    (Discussion off the record.)
9    THE VIDEOGRAPHER: Thank you. We're back on
10  the record. The time is 11:52.
11       FURTHER EXAMINATION
12  BY MR. SEEDORF:
13   Q. Ted, how much time did you spend at the
14  Northern Lights branch during the 12 months prior to
15  Dwight's departure?
16   A. Not very much time, maybe once a week.
17   Q. And what did you do in those -- what brought
18  you over there?
19   A. Various odds and ends. It could be picking
20  up a job, it could be talking about an issue, having a
21  quick meeting instead of talking over the phone, just
22  to kind of visit.
23   Q. Okay. You were asked questions both on
24  direct and cross about your comment that Dwight acted
25  as a camp counselor. Did you observe this going on

Page 100

1  when you were there?
2    A. No, I DID not observe.
3    Q. So what is your source of information on that
4  subject?
5    A. Dwight.
6    Q. And what did Dwight tell you about this --
7  these conversations?
8    A. He would tell me about the conversations he's
9  having with some of his employees and he would talk
10  about them, information that there's no way he could
11  find out unless he had conversations with them. And
12  he would tell me he had conversations with them.
13   Q. Did he tell you when and where the
14  conversations occurred?
15   A. No, when and where, no.
16   Q. And you didn't feel that the depth of the
17  subjects that he was discussing with them was
18  something that you would be discussing with employees?
19   A. Correct, in or out of the workplace.
20   Q. You talked with Mr. Daniel about order forms
21  that were incorrect. And you indicated that Dwight
22  was one of the worst offenders. What time frame are
23  we talking about here?
24   A. When I was assistant manager at Diamond.
25   Q. And at that point Dwight was the branch

Page 101

1  manager at Diamond?
2    A. Manager, correct.
3    Q. Did you observe order forms from Dwight
4  Greene while Dwight was branch manager at Northern
5  Lights?
6    A. I'm sure I've seen a couple. I don't recall.
7    Q. Are you referring to those order forms when
8  you made those comments?
9    A. No.
10   Q. You were talking about the Jet-Lite system
11  and your observation that Dwight wasn't following the
12  system. Did Dwight ever make any comments to you
13  about the computer that was used for the entry of the
14  information into the Jet-Lite system?
15   A. His Northern Lights computer?
16   Q. Yes.
17   A. He said it was outdated and slow.
18   Q. Did he indicate that that was impacting the
19  input of information into the Jet-Lite system?
20   A. He said it was, yes.
21   Q. Do you know if that computer was ever
22  replaced?
23   A. I don't think it was. I think it was --
24  because I remember thinking that this Jet-Lite system
25  is really slow when I went over there.

26 (Pages 98 to 101)

BEAN & ASSOCIATES, INC.
info@litsupport.com   500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102   505-843-9494
52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

Page 102

1    Q.  So you experienced the same problem?
2    A.  Yeah.  It's just slow in the Jet-Lite system.
3    Q.  Did Dwight tell you that he had sought to
4  have the computer replaced and that it had been
5  rejected?
6    A.  Yes.
7    Q.  We had talked a little bit earlier about the
8  two assistant managers at Diamond that were
9  terminated, I think they were terminated by the loss
10  prevention people?
11    A.  Yes.
12    Q.  Was there a particular problem that these two
13  assistant managers had that was affecting loss
14  prevention?
15    A.  One of -- yeah, yes.
16    Q.  What kind of problems are we talking about
17  here?
18    A.  One person took a job home without paying for
19  it.  And the other one was discounting jobs in return
20  for favors.
21    Q.  And these were assistant managers that
22  reported to you?
23    A.  Yes.
24    Q.  Had they -- were you aware of the problems?
25    A.  No.

Page 103

1    Q.  How were the problems discovered?
2    A.  Apparently, when Bill Sanchez, the loss
3  prevention manager, came up, he found some issues with
4  the closing managers such as Nick Smith was falsifying
5  records that he had been checking the security system
6  every day.  And he wasn't -- or no, he was doing
7  security audits once a month.  And he was not, he was
8  signing off that he was.
9      So Bill Sanchez in learn this asked him more
10  questions and unearthed this other stuff before.  And
11  Bill Sanchez had no idea beforehand that Nick was
12  doing this, Nick just admitted to it and the rest is
13  history.
14      Clancy Derrick, I'm not sure exactly how the
15  questioning began with him.  But it began in one form
16  or another and led up to him admitting to taking a job
17  home without paying it -- paying for it.  And he was
18  terminated for dishonesty.
19    Q.  You talked about the input of inaccurate
20  times with respect to the Jet-Lite system and
21  indicated that Dwight I think on one occasion at least
22  instructed you to input the incorrect time?
23    A.  Yes.
24    Q.  Again what time frame are we talking about?
25    A.  When I was assistant manager under his

Page 104

1  management.
2    Q.  And that's at the Diamond store?
3    A.  Yes.
4    Q.  Are you aware of any instructions or input by
5  Dwight of improper times at the Northern Lights store?
6    A.  No.
7    Q.  Did you go ahead and input the improper time?
8    A.  No.
9    Q.  What did you do?
10    A.  I left it red or I would put in the right
11  time.
12    Q.  Did you tell Dwight what you were doing?
13    A.  No.
14    Q.  Did you complain to anyone in the Kinko's
15  organization that Dwight had instructed you to put in
16  the improper time?
17    A.  No.
18    Q.  Did you ever discuss that with anyone else?
19    A.  No.
20    Q.  Did you say anything to Dwight when he gave
21  you that instruction?
22    A.  No.
23    Q.  You began interim management of the Northern
24  Lights store in January of 2004.  And that, continuing
25  through the time you left in October of '04, would

Page 105

1  have been something on the order of maybe nine months?
2    A.  Correct.
3    Q.  Did the MS scores at the Northern Lights
4  store improve during that period of time?
5    A.  No, they stayed flat.
6    Q.  You said -- I'm trying to understand this.
7  You said neither of the stores were doing well because
8  of their prior numbers.  I think you were referring to
9  the --
10    A.  The previous year.
11    Q.  -- 2003 time frame?
12    A.  Yes.
13    Q.  Can you explain that in a little more detail
14  for me.  How did the prior numbers affect how you were
15  doing that year?
16    A.  Well, the prior numbers were fairly high
17  because of, you know, anomalies such as strange
18  accounts that came in.  One example is, at the Diamond
19  branch in January, we had a strange guy come in from
20  somewhere in some northern village and wanted to print
21  up 20,000 books and paid with a credit card right then
22  and there.
23      The job was like $12,000.  The next year we
24  have this inflated number that we're supposed to beat
25  from the previous year and we didn't beat it.  And so

27  (Pages 102 to 105)

BEAN & ASSOCIATES, INC.
info@litsupport.com    500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102    505-843-9494
52ebj3e8-e709-4ca7-9b9c-fcf936a2f162

Page 106

1   all the sales figures from the previous year were kind
2   of like that, where both stores prospered and then the
3   next year we were expected to beat all of those great
4   numbers.  And, if we didn't, it affected our manager
5   profit.
6       Q.  Okay.  So both stores had done quite well in
7   2002?
8       A.  Yes.
9       Q.  And, if you do well, do I understand then
10  that your goals and your targets for the next year are
11  affected by that?
12      A.  Yes.
13      Q.  And, if you don't achieve those goals or
14  targets, then that affects your ability to bonus?
15      A.  Yes.
16      Q.  And how were the numbers for the stores in
17  2001?
18      A.  They were good as well.  And we beat -- we
19  beat a lot of those numbers in the next year.  We kept
20  climbing.  And then it just stopped.
21      Q.  And why do you think it stopped?
22      A.  I have no idea.  It was -- the business in
23  the printing world is fairly fickle.
24      Q.  So Northern Lights was down in 2003 in terms
25  of volume?

Page 107

1       A.  Yes.
2       Q.  And Diamond was down in 2003 in terms of
3   volume?
4       A.  Yes.
5       Q.  How was Fairbanks doing in 2003?
6       A.  They were down as well.
7       Q.  Were there new entrants into the market in
8   Anchorage and/or Fairbanks in terms of the copy
9   business in 2003?
10      A.  Yeah.  I mean it's a very competitive market.
11  ICopy is one that was cutting into our business quite
12  a bit.  The guy that manages that place is very shrewd
13  and was able to bid low on a lot of big jobs that we
14  normally were getting.
15      Q.  Was it your perception that that affected
16  your numbers in 2003?
17      A.  It did have an affect, yes.
18      Q.  Did you ever raise that to Ron or anyone else
19  above you in Kinko's?
20      A.  Oh, yeah, we talked about it all the time at
21  meetings and whatnot, about how the competition in
22  Anchorage is fierce, you know.
23      Q.  You said there were six to eight computers in
24  the break room at -- excuse me.  In the training room
25  at the Northern Lights store when you took over in

Page 108

1   January of 2004.  Do you know how long they had been
2   there?
3       A.  I don't recall.
4       Q.  Do you recall seeing them there before when
5   you visited the Northern Lights branch from time to
6   time?
7       A.  No.
8       Q.  What kind of machines were they?
9       A.  They were the computers used in the computer
10  department for customers to use, like Windows based
11  machines and Apple based.
12      Q.  And had there been a changeout so that newer
13  equipment was being used by the customers?
14      A.  Yes.
15      Q.  And do you know when that changeout occurred?
16      A.  I do not, no.
17      Q.  What did you have to do to return them?
18      A.  We have to track the serial number down in
19  the P&L statement, box them up, make sure that they're
20  boxed up properly so that we could send them back, and
21  mail them off.
22      Q.  And you followed up on that after you took
23  over.  How long did it take to you get that done?
24      A.  It still wasn't finished when I left.  But it
25  was -- they were all inventoried.  I had someone in

Page 109

1   charge of managing that particular area.  And it was
2   just a matter of just boxing them up and shipping them
3   out by the time --
4       Q.  By the time you got done?
5       A.  Yeah.
6       Q.  But they were there when you took over so it
7   was a matter of a number of months before that was --
8       A.  Yeah, oh, yeah.
9       Q.  It's not something you just put a label on it
10  and stick it in the mailbox?
11      A.  Right.  Well, it depends on the situation.
12  In my particular situation, I didn't have -- I had to
13  prioritize issues I had to deal with.  And that was
14  not an important issue for me at the time.
15      Q.  Okay.  What was the -- I'll go at it another
16  way.
17          How did the volume of business in 2004, at
18  least the portion of 2004 that you were there at
19  Kinko's, compare with the corresponding portion of
20  2003?
21      A.  I don't know.
22      Q.  And I'm trying to look at an overall trend.
23      A.  Sure.
24      Q.  We looked at 2001 and you said it was a good
25  year and 2002 was a better year and then things went

28  (Pages 106 to 109)

EXHIBIT: A
Page 7 13
52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

Page 110

1   down in 2003.  Can you give me some sense of how 2004
2   compared to those years?
3       A.  It was panning out to be a pretty bad year.
4   We were down in sales just about every month for both
5   branches.  And --
6       Q.  The Diamond store too?
7       A.  Yeah.  And I wasn't getting any bonuses.
8       Q.  Okay.
9       A.  They made me a deal when I became interim to
10  get the bonus from -- if the cluster profits, I would
11  get the bonus from Northern Lights, and needless to
12  stay I didn't get a bonus at all during that whole
13  interim period except for when I agreed to take over
14  the Northern Lights branch in an official capacity.
15  One of my stipulations was that I would receive a
16  guaranteed bonus for the first three months.
17      Q.  Okay.
18      A.  And they gave me that.
19      Q.  I gather from your testimony that you had
20  issues with respect to Dwight having Laurie as an
21  assistant manager within the store that he operated?
22      A.  Yes.
23      Q.  Did you raise those issues with Ron?
24      A.  No.
25      Q.  Did you raise them with anyone else in the

Page 111

1   Kinko's organization?
2       A.  No.  I mean I might have made an off comment
3   to Ron at one point, but it was nothing serious or
4   anything that I wanted to follow up on.  I knew Laurie
5   was not a fan of my style so I didn't really want her
6   in my store anyways at that point.
7       Q.  Had you and Laurie had any run-ins,
8   disagreements over work in the past?
9       A.  Just one -- there was a couple issues right
10  before Dwight left to take over the Northern Lights,
11  where she was upset that I had some of my people on
12  swing shift doing typesetting in the computer
13  department because she was managing the computer
14  department.
15      And the reason we did that was because we had
16  taken care of production.  And we moved into the
17  computer department to take care of that work as well
18  so that we can get on top of everything.
19      The second issue was they had several file
20  cabinets of old customer documents.  And I got rid of
21  those because we were no longer supposed to have the
22  customer jobs on file at the branch anymore.  And she
23  lost I guess a couple customer -- valuable customer
24  jobs because of that which is totally my fault.
25      Q.  You hadn't discussed it with her before you

Page 112

1   discarded them?
2       A.  No, no.  And she was justifiably angry about
3   it.  But, at the same time, it was -- I thought it was
4   a change we need to make.
5       MR. SEEDORF:  Okay.  I think that's all I
6   have.  Thank you.
7       THE WITNESS:  Okay.
8       MR. DANIEL:  I have just a few follow-ups.
9       (Exhibit No. 1 was marked.)
10          FURTHER EXAMINATION
11  BY MR. DANIEL:
12      Q.  I'm going to hand you what we'll mark as
13  Exhibit 1 to your deposition.  This is a Branch
14  Execution Assessment dated November 18, 2003.  Do you
15  ever recall seeing this before?
16      A.  I'm sure I have, but I sure don't remember
17  it.
18      Q.  Well, this would indicate that it's a branch
19  execution assessment for the Diamond branch?
20      A.  Yeah.
21      Q.  And, on November 18, 2003, it indicates that
22  you were the branch manager and Ron Kuhn was the
23  district manager?
24      A.  Yes.  The part I'm confused about is the
25  branch type, because I was a spoke and it says hub,

Page 113

1   hub node.  I don't know if that's a continuation of
2   the next column or what.
3       Q.  What are you looking at?
4       A.  Right there.
5       Q.  Oh, where it says hub branch?
6       A.  Yeah.
7       Q.  And you're saying it should say spoke branch?
8       A.  Correct.  It might just be a typo, I don't
9   know.
10      Q.  Okay.  Well, in any event, if you look at the
11  second box here, there's -- it's called branch
12  specific goals.  Do you see that?
13      A.  Branch, yeah.
14      Q.  And this lists the year to date sales,
15  payroll, supplies, and branch contribution.  Do you
16  see that?
17      A.  Uh-huh.
18      Q.  And is that column for the branch, for the
19  Diamond branch?
20      A.  Yes.
21      Q.  So that would indicate that, as of November
22  18, 2003, the total sales were $1,622,842?
23      A.  Correct.
24      Q.  And the percentage of that to what your plan
25  was 96.2 percent?

29  (Pages 110 to 113)

EXHIBIT: A
Page 2 of 3

Page 114

1    A.  Yes.
2    Q.  All right.  And, if I understand your
3  previous testimony correct, you wanted it to be
4  100 percent or better?
5    A.  Correct, yes.
6    Q.  Okay.  And then, if you look at the next
7  column, it has the last month sales.  And it shows
8  that they are $182,480; is that correct?
9    A.  Yeah, exceeded plan that month.
10    Q.  So that month was a good month, it was 106
11  percent?
12    A.  Yes.
13    Q.  And then, if you look at the last column
14  there, it says hub/spoke network month to date.  And
15  so that combines both Northern Lights and Diamond?
16    A.  Correct.
17    Q.  But this doesn't show what the Northern
18  Lights branch was doing during this same time period;
19  is that right?
20    A.  No.  But, if you subtract my total from that
21  month to date, you would get theirs.
22    Q.  You would just get it for the month to date?
23    A.  Yeah, correct.
24    Q.  Not the year to date?
25    A.  Yeah, true.

Page 115

1    Q.  Or not even the previous month of October?
2    A.  Correct.
3    Q.  And then, if you look in the third box called
4  dashboard, dash, branch measurements, do you see that?
5    A.  Uh-huh.
6    Q.  And this is where it lists the year -- first
7  of all the year to date MSM score.  And your branch is
8  94.7 percent?
9    A.  Correct.
10    Q.  And it has the year to date mystery shops
11  score?
12    A.  Yes.
13    Q.  And that's 100 percent?
14    A.  Yes.
15    Q.  And then your year to date done right score
16  was 89.9 percent?
17    A.  Yes.
18    Q.  And your year to date on time score was 97
19  percent?
20    A.  Yes.
21    MR. SEEDORF:  Counsel, was this part of the
22  document production?
23    MR. DANIEL:  Yes.  If you look on the --
24    MR. SEEDORF:  There's a number down there.
25    MR. DANIEL:  There's a number on the bottom.

Page 116

1    MR. SEEDORF:  Okay.
2    MR. DANIEL:  So you should have a copy of it.
3  BY MR. DANIEL:
4    Q.  You testified just a moment ago, when
5  Mr. Seedorf was asking you questions, that Dwight
6  Greene complained that the Jet-Lite computer at
7  Northern Lights was outdated and slow.  And, when you
8  took over, you thought that was true?
9    A.  Yes.
10    Q.  And -- but, despite that fact, were you able
11  to keep the information that was supposed to be in the
12  Jet-Lite system up-to-date?
13    A.  For the most part, we were making strides
14  towards that.  But it was correcting a lot of bad
15  habits.  It was not -- it was not a very fast process.
16  We were -- the Jet-Lite was improving.  But it was
17  nowhere near where I wanted it to be.
18    Q.  And the bad habits that you referred to, what
19  were those?
20    A.  Just the general feelings towards the
21  Jet-Lite and even the assistant manager didn't like
22  the Jet-Lite.  And I think that was all adopted from
23  the previous management system.
24    Q.  But these were problems with how employees
25  were treating the system?

Page 117

1    A.  Yeah.
2    Q.  Not the computer?
3    A.  Correct.
4    Q.  Okay.  And, while you were there, did you get
5  a faster, more up-to-date computer to do the Jet-Lite
6  system?
7    A.  No.
8    Q.  Did you ask for one?
9    A.  I did not, no.
10    Q.  You also testified that, in the -- what was
11  it, about ten months that you were the manager of the
12  Northern Lights branch before you resigned, you said
13  during that period that the MS scores stayed flat?
14    A.  Yes.
15    Q.  And in your opinion did the merger with
16  Federal Express have any impact on your MSM scores?
17    MR. SEEDORF:  Objection, speculation.
18  BY MR. DANIEL:
19    Q.  You can answer.
20    A.  I think so.
21    Q.  Why?
22    A.  We had a brand-new department that was tossed
23  into the front of our full service area.  And we had a
24  lot of training to do.  And the focus which should
25  have been on done right and on time in my opinion was

30  (Pages 114 to 117)

BEAN & ASSOCIATES, INC.
info@litsupport.com    500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102    505-843-9494
52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

Page 118

1 shifted towards this FedEx merger and adopting this
2 new department.
3      And, though it may be great in the long term,
4 during this period it destroyed any hopes I had of
5 trying to improve the MSM and focus on done right and
6 on time because the company's primary focus was on the
7 FedEx implementation within the branch.
8      Q. And how did the FedEx merger impact your
9 branch? In other words, were there additional things
10 that you had to do that you weren't previously doing?
11      A. Yes. We had a lot of people coming in all of
12 a sudden wanting to ship their packages. So we had to
13 process the shipping of their packages. We obtained a
14 lot of new equipment concerned with packaging of their
15 items. So now people could bring in artwork or a
16 bicycle or any of these kind of items and we would box
17 them and ship them for them.
18      And this was all detracting from a current
19 problem in the branch which was the current
20 operations, the done right and on time. So all of
21 this new FedEx operations was kind of strangling my
22 other goals.
23      Q. And what were the other factors that you
24 thought that contributed to the flat MSM scores
25 besides the MS -- desides the FedEx merger?

Page 119

1      MR. SEEDORF: Same objection.
2      THE WITNESS: There was a lot of turnover in
3 the store when I first took over, a lot of changes I
4 was making in relation to communicating job goals and
5 responsibilities. And, because of the turnover, a lot
6 of people didn't know how to process much of the work
7 that came in. I had a brand-new core team of
8 assistant managers.
9      Ryan was just new into the position of a
10 month or so. And Onnie was coming from out of state
11 and was brand-new, didn't know anybody there. And
12 Sheila, who was the third assistant manager, she was
13 new to the position and was learning her role and
14 responsibilities.
15      So there just was -- between all of the new
16 people, the loss of Dwight and Laurie who held most of
17 the knowledge in their own hands and so no one else
18 knew exactly how to process other things, and the
19 FedEx merger all contributed to create one chaotic
20 environment for that period that I was over there.
21 BY MR. DANIEL:
22      Q. Did any of the employees at the Diamond store
23 make comments to you about Dwight's leadership of the
24 store?
25      A. Employees at the Diamond store?

Page 120

1      Q. Yes.
2      A. Yes.
3      Q. And what did they tell you?
4      MR. SEEDORF: Objection, foundation. Go
5 ahead.
6      THE WITNESS: One employee told me that it
7 would be nice working for Kinko's for a change.
8 Everyone realized that, once I took over the branch,
9 that it was going to be Kinko's way, not Dwight's way,
10 and that any issues that I brought up to them
11 concerning development or counseling was going to be
12 strictly from the basis of Kinko's policy and not from
13 my own subjective reasoning.
14 BY MR. DANIEL:
15      Q. And who was that employee?
16      A. That was Rick Balgenorth,
17 B-a-l-g-e-n-o-r-t-h.
18      Q. Any other employees make comments to you
19 about Dwight's management of the Northern Lights
20 store?
21      A. My assistant managers, Nick Smith and Joanie
22 Morelli.
23      Q. What did Nick say?
24      A. He preferred my style over Dwight's. He said
25 that I was anal about a lot of things in the branch,

Page 121

1 but it's helping him understand his role better and
2 that all of my ideas about improving the branch and
3 its systems were making sense and improving the
4 atmosphere there versus Dwight's systems which were a
5 lot of, you know, do as I say, not as I do and
6 whatnot.
7      Q. And what did Joanie Morelli tell you?
8      A. Similar, similar issues. And they maintained
9 their friendship with Dwight. Everyone -- everyone is
10 friends with Dwight. It's just they understood that
11 my way of running the business was good for the
12 business.
13      MR. DANIEL: Nothing further.
14      MR. SEEDORF: Well, we've each had two turns.
15 But, since you brought up a new document, I do have
16 some questions.
17      FURTHER EXAMINATION
18 BY MR. SEEDORF:
19      Q. Looking at the November 18, 2003, BEA that
20 was performed by Mr. Kuhn, you were looking at box two
21 above. Do you see the various year to date, last
22 month, current month, and hub/spoke network to date?
23      A. Yes.
24      Q. I gather the last two of those particular
25 sets of scores, the current month to date and the

BEAN & ASSOCIATES, INC.
info@litsupport.com   500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102   505-843-9494

52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

Page 122

1  hub/spoke network to date, are the ones that you said
2  you could use to compare the performance at the
3  Northern Lights branch with respect to what was
4  happening at the Diamond branch?
5      A.  Yes.
6      Q.  Year to date, is there information here that
7  would allow you to see what's going on at Northern
8  Lights?
9      A.  No.
10     Q.  So it's just month to date?
11     A.  Month, month.
12     Q.  Okay.  And current month to date?
13     A.  Yes.
14     Q.  So this is -- what we're looking at here is
15 performance during the first 18 days of November of
16 2003?
17     A.  Yes.
18     Q.  Okay.  And in that sense the volume at
19 Diamond was 82,377, correct?
20     A.  Yes.
21     Q.  And that was 84 percent of the sales plan?
22     A.  Correct.
23     Q.  And the hub/spoke combined, that would have
24 been both Diamond and Northern Lights?
25     A.  Yes.

Page 123

1      Q.  Was 217,427.  And that would be 83.4 percent
2  of the sales to plan?
3      A.  Correct.
4      Q.  Okay.  So generally speaking neither of the
5  two stores were showing stellar performance month to
6  date on November 18, 2003?
7      A.  Correct.
8      Q.  And from that you could back into a month to
9  date sales number for Northern Lights if you wanted
10 to?
11     A.  Yes.  Yeah, they were --
12     Q.  If you wanted to take your calculator, you
13 could calculate it?
14     A.  Yeah, it looked like they were doing 40 so
15 more than the Diamond branch.
16     Q.  Okay.  The next box down, the box three, has
17 in the right hand columns of it a scoring assessment?
18     A.  Uh-huh, yes.
19     Q.  And that includes previous BEA, it says 0.0
20 percent.  Would I conclude that they just don't have
21 the information available to fill in that box?
22     A.  It's hard to say.  I don't know why that
23 isn't filled in.
24     Q.  Okay.  And then it has a job compliance score
25 of 61 out of 81?

Page 124

1      A.  Yes.
2      Q.  And that I gather is computed in the next box
3  down?
4      A.  Yes.
5      Q.  At 75.3 percent?
6      A.  Yes, not good.
7      Q.  And then it shows a BEA score of 141.5 over
8  175?
9      A.  Yes.
10     Q.  And that computes to 80.9 percent?
11     A.  Correct.
12     Q.  Is there a target for what you're trying to
13 achieve in BEA scores?
14     A.  Ninety.
15     Q.  So it was 90 for the BEA and 90.5 for the MSM
16 then?
17     A.  As far as I -- the best of my recollection.
18     Q.  Okay.  Did Mr. Kuhn discuss this BEA score
19 with you at that time?
20     A.  Oh, I'm sure he did.  I don't remember.
21     Q.  Okay.  Were there particular problems that
22 led to the low score on this particular instance that
23 you recall?
24     A.  Well, we striked out at number three at the
25 bottom job compliance on every single job.  What I can

Page 125

1  remember is a lot of times we would put jobs with the
2  originals in a box and he would want them in an order
3  envelope according directly to the BEA.
4          Even though in some practical reason it might
5  be better to not follow the exact wording of the BEA,
6  he looks like he struck me out on that every time.
7  And that's Ron in a nutshell for you.  He follows
8  these things to the letter even if it's not that
9  practical in the branch to do.
10     Q.  Okay.  I notice in job compliance item No. 2
11 deals with the Jet-Lite order form?
12     A.  Yes.
13     Q.  And I gather there was a problem on one out
14 of the six jobs there?
15     A.  Yeah, it could have been customer phone
16 number, name, number of Jet-Lite, wholesale number, or
17 bin number.  There's like five parts to that one -- to
18 that one question.  And, if you miss one of those, he
19 would strike you out on it.
20     Q.  And in No. 8, that deals with the Jet-Lite
21 being entered within 60 minutes from the time the
22 order was taken?
23     A.  Yeah, yeah.
24     Q.  And you got five out of six on that?
25     A.  Yeah.

32 (Pages 122 to 125)

Page 126

1    Q.  Number 9, does the log entry include various
2  specific items.  And you got four out of six on that.
3    A.  Yeah.
4    Q.  Correct?  And then on No. 10, does the log
5  entry include the total dollar amount of the job for
6  future selling opportunities.  And you got one out of
7  six on that?
8    A.  Yeah.  That was something we didn't really do
9  a whole lot of back then, was write the total dollar
10 amount of the job in the Jet-Lite.  And this is
11 2000 -- I remember starting that up.  And we were
12 pretty diligent about it afterwards.  So this might be
13 the BEA that launched that whole thing.
14   Q.  So after this you were more careful on that
15 subject?
16   A.  Yeah.  And, you know, I'm starting to kind of
17 remember that maybe this was a new version of the BEA
18 and that's why there's not a zero -- there's not a
19 previous BEA done.
20   Q.  So they changed the BEA?
21   A.  Yeah, it says revised November '03 which
22 means that this is a brand-new revision.  And that
23 could have been a new entry into the revision, the
24 dollar amount on the Jet-Lite order.  And that's why
25 we didn't do very well on it.  I don't know, though.

Page 127

1  It's awhile back.
2    Q.  Was item No. 3, customer folders on Jet-Lite,
3  was that a new entry too or was that something that
4  was there before?
5    A.  I think that might have been there before.
6  We were never very good at that particular one because
7  in a lot of cases the originals placed an 11 by 17
8  original folder which was just a piece of paper.
9         Within the order envelope, a lot of times our
10 originals were thick documents like this thick.  And
11 it was not practical to put them in anything but a
12 box.  Sometimes they were -- if you put just a single
13 original sheet of paper in this piece of paper folder
14 and put it in a bag, it can be crinkled up so we would
15 put it in a box.
16        But he would -- and that's what I'm talking
17 about, the practical reasons no why we didn't do it.
18 And, because the wording states that we should put it
19 in a folder in an order bag envelope, we got it wrong.
20   Q.  Okay.  In your view was it more practical to
21 put it in a box or in a folder?
22   A.  In a box.
23   Q.  So you think your solution was better?
24   A.  Yeah.
25   Q.  But it didn't matter?

Page 128

1    A.  It didn't matter because the BEA stated, you
2  know, that we, yeah, had to do it one way.
3    Q.  You were also asked some questions about
4  employee comments.  And you listed three people's
5  names, Rick Balgenorth.  Was he an employee at
6  Northern Lights or at Diamond?
7    A.  Diamond.
8    Q.  At Diamond?
9    A.  Diamond.
10   Q.  Okay.  And Nick Smith and Joanie Morelli were
11 also at the Diamond store?
12   A.  Yes.  That's when I took over management
13 there.
14   Q.  And Rick's comment was it would be nice to
15 work for Kinko's instead of Dwight?
16   A.  Yes.
17   Q.  Wasn't Rick reporting to you?
18   A.  At that time?
19   Q.  Yeah.
20   A.  Yes.
21   Q.  Okay.  And were you not setting the policy or
22 making the decisions in the Diamond store at that
23 time?
24   A.  I made an announcement that I was making the
25 policies.  But it was not me making them, it was

Page 129

1  Kinko's making the policies, that I am the manager for
2  Kinko's.  This is not Kinko's office -- or this is not
3  my office, this is Kinko's office.
4    Q.  And this is when you took over management of
5  the Diamond branch?
6    A.  Diamond branch, yes.
7    Q.  So we are talking sometime back in 2000?
8    A.  This is when Dwight first took over the
9  Northern Lights branch.
10   Q.  Okay.  So we're talking back in roughly 2000?
11   A.  Yeah.  It may be old hat now.
12   Q.  Okay.  And were any of those employees still
13 with the company in January of 2004, when Dwight left?
14   A.  Joanie and Rick were.
15   Q.  And Nick had moved on?
16   A.  Yes.
17      MR. SEEDORF:  Okay.  That's all I have.
18      MR. DANIEL:  Just one quick follow-up from
19 that question.
20          FURTHER EXAMINATION
21 BY MR. DANIEL:
22   Q.  When you took over the Northern Lights branch
23 in January '04 and during this time you were managing
24 the Northern Lights branch, did any employees make
25 comments to you about Dwight Greene's management of

33 (Pages 126 to 129)

EXHIBIT: A
Page 12 of 13

52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

Page 130

1  the store?
2      A.  Brian Roberts told me that one story
3  concerning his problem with Laurie and Dwight, about
4  trying to resolve an issue he had with Laurie and not
5  getting it resolved.  I started organizing all the
6  paperwork and bookkeeping.
7      And Sheila made a comment that it's funny
8  that Dwight never had the time to do this.  Those are
9  the only two right off the -- and I think they made
10 some comments about the break room, but I don't
11 remember what they were.  That was kind of a pave the
12 road gesture on my part.
13     Q.  What is Sheila's last name?
14     A.  Sheila -- I don't remember.  I'm sorry.
15     MR. DANIEL:  No further questions.
16     MR. SEEDORF:  I think we're done.
17     THE WITNESS:  Okay.
18     THE VIDEOGRAPHER:  Thank you.  That concludes
19 the deposition.  We're going off the record.  The time
20 is 12:36.  Thank you.
21     At 12:36 p.m. the deposition was concluded.)
22
23
24
25

Page 131

1       IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF ALASKA
2
  DWIGHT GREENE,
3
       Plaintiff,
4
    vs.    Case No. A04-0160 CV (RRB)
5
  FEDEX KINKO'S OFFICE
6 AND PRINT SERVICES, INC.,
7      Defendant.
8
       CERTIFICATE OF COMPLETION OF DEPOSITION
9    I, JAN A. WILLIAMS, New Mexico CCR #14, DO
  HEREBY CERTIFY that on April 7, 2006, the deposition
10 of THEODORE R. COLLINS was taken before me at the
  request of, and sealed original retained by:
11
       For the Plaintiff:
12   HUGHES BAUMAN PFIFFNER GORSKI & SEEDORF,
     LLC
13   3900 C Street, Suite 1001
     Anchorage, Alaska  99503
14   MR. JAMES M. SEEDORF
15     I FURTHER CERTIFY that copies of this
  certificate have been mailed or delivered on _____,
16 with changes, if any, by the witness appended, to the
  following counsel of record and parties not
17 represented by Counsel:
18     For the Defendant:
     PERKINS COIE, LLP
19   1029 West Third Avenue, Suite 300
     Anchorage, Alaska  99501
20   MR. THOMAS M. DANIEL
21     I FURTHER CERTIFY that examination of this
  transcript and signature of the witness was waived by
22 the witness and all parties present.
23     I FURTHER CERTIFY that the recoverable cost
  of the original and one copy of the deposition,
24 including exhibits, to MR. JAMES M. SEEDORF is
  $_____.
25

Page 132

1       I FURTHER CERTIFY that I did administer the
  oath to the witness herein prior to the taking of this
2 deposition; that I did thereafter report in
  stenographic shorthand the questions and answers set
3 forth herein, and the foregoing is a true and correct
  transcript of the proceeding had upon the taking of
4 this deposition to the best of my ability.
5       I FURTHER CERTIFY that I am neither employed
  by nor related to nor contracted with (unless excepted
6 by the rules) any of the parties or attorneys in this
  case, and that I have no interest whatsoever in the
7 final disposition of this case in any court.
8
9
10
11
12
13
14
15

16       _____
         JAN A. WILLIAMS
         Certified Court Reporter #14
17       License Expires:  12/31/06
18
19
20
21
22
23
24  (571A) JAW
    Date taken:  April 7, 2006
25  Proofread by:  JB

Page 133

1            RECEIPT
2  DATE:  April 7, 2006
3  JOB NUMBER:  (571A) JAW
4  WITNESS NAME:  THEODORE R. COLLINS
5  CASE CAPTION:  Greene vs. FedEx
6  *************************
7  ATTORNEY:  MR. JAMES M. SEEDORF
8  DOCUMENT:  Transcript / Exhibits / Disks / Other ____
9  DATE DELIVERED: _____ DEL'D BY: ____
10 REC'D BY: _____ TIME: _____
11 *************************
12 ATTORNEY:  MR. THOMAS M. DANIEL
13 DOCUMENT:  Transcript / Exhibits / Disks / Other ____
14 DATE DELIVERED: _____ DEL'D BY: ____
15 REC'D BY: _____ TIME: _____
16 *************************
17 ATTORNEY:
18 DOCUMENT:  Transcript / Exhibits / Disks / Other ____
19 DATE DELIVERED: _____ DEL'D BY: ____
20 REC'D BY: _____ TIME: _____
21 *************************
22 ATTORNEY:
23 DOCUMENT:  Transcript / Exhibits / Disks / Other ____
24 DATE DELIVERED: _____ DEL'D BY: ____
25 REC'D BY: _____ TIME: _____

BEAN & ASSOCIATES, INC.

EXHIBIT: A
Page 13 of 13

info@litsupport.com    500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102    505-843-9494

52cb13e8-c70e-4ca7-9b9c-fcf936a2f162

James M. Seedorf
Hughes Bauman Pfiffner
  Gorski & Seedorf LLC
3900 C Street, Suite 1001
Anchorage, Alaska 99503
(907) 263-8225

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DWIGHT GREENE,<br><br>          Plaintiff,<br><br>vs.<br><br>FEDEX KINKO'S OFFICE AND PRINT<br>SERVICES, INC.<br><br>          Defendant. | |

Case No. A04-0160 CV (RRB)

### AFFIDAVIT OF CHERI PEREZ

| | |
|---|---|
| STATE OF OREGON<br><br>COUNTY OF _____ | ss |

**CHERI PEREZ**, being first duly sworn upon oath, deposes and states as

follows:

          1.      I was employed at Kinko's from 1991 -- 1998 and January 2002 --

October 2003.

*Affidavit of Cheri Perez -* Page 1 of 3
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246137(8609-1)

EXHIBIT *B*
Page *1* of *3*

2.    I was employed at the Dimond store as the Bookkeeper and Assistant Manager in approximately 1998 with Dwight Greene as my supervisor.

3.    I also worked with Dwight Greene at the Northern Lights store where my duties included Express, the front counter, bookkeeping, running machines, ordering supplies, quality checking and checking orders into the Jetlite system.

4.    I found Dwight to be a proficient manager.    Cross training employees was very important to Dwight.    During Dwight's tenure at Kinko's all assistant managers were trained to order supplies.

5.    The Northern Lights store was a very busy branch, but it was always kept clean and never looked trashy.

6.    Dwight held monthly store meetings where we discussed the Jetlite system, job "on-time" ratios, MSM scores, the budget, profits/losses, new equipment, as well as employee concerns and/or opinions.    Additional meetings would sometimes be held to discuss the Jetlite system or other important store operations.

7.    Dwight was a very "hands on" manager.    He knew how to get his employees to work as a team and he would always pitch in when needed and even work the floor when they were short-staffed.

8.    Dwight is very outgoing and personable with an "open door" policy. However, Dwight expected his employees to keep their personal problems outside of work.

*Affidavit of Cheri Perez* - Page 2 of 3
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246137(8609-1)

9.      Dwight believed, and relayed to his employees, that the customer always comes first.  As such, when he left the Dimond store to take over the Northern Lights store, several customers from the Dimond store followed Dwight.

Further your affiant sayeth naught.

_____
**Cheri Perez**

SUBSCRIBED AND SWORN TO before me this ___ day of May, 2006.

_____
NOTARY PUBLIC in and for Oregon
My Commission Expires: _10-05-09_

> OFFICIAL SEAL
> **KIMBERLY L BOATMAN**
> NOTARY PUBLIC - OREGON
> COMMISSION NO. 398062
> MY COMMISSION EXPIRES OCTOBER 5, 2009

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was ☒ faxed ☐ hand delivered and/or ☐ mailed this 5 day of May 2006 to:

Thomas M. Daniel, Esq.
Perkins Coie LLP
1029 W. 3rd Avenue, Suite 300
Anchorage, AK 99501

_____
**Michelle Martin**

*Affidavit of Cheri Perez* - Page 3 of 3
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246137(8609-1)

James M. Seedorf
Hughes Bauman Pfiffner
  Gorski & Seedorf LLC
3900 C Street, Suite 1001
Anchorage, Alaska 99503
(907) 263-8225

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DWIGHT GREENE,

              Plaintiff,

vs.

FEDEX KINKO'S OFFICE AND PRINT
SERVICES, INC.

              Defendant.

Case No. A04-0160 CV (RRB)

**AFFIDAVIT OF JOE POYDACK**

STATE OF ALASKA

THIRD JUDICIAL DISTRICT

ss

        **JOE POYDACK**, being first duly sworn upon oath, deposes and states as follows:

*Affidavit of Joe Poydack* - Page 1 of 4
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246139(8690-1)

EXHIBIT: _C_
Page _1_ of _4_

1.      I was employed as a Key-Op at Kinko's from approximately November 2000 through October 2005.   Dwight Greene was my supervisor at the Northern Lights Branch.

2.      Dwight was a very "hands on" manager.  We worked side by side with team members on the floor several times.

3.      Dwight was proficient and knowledgeable about the machines at Kinkos.  He personally trained me on the Info-Print and color copier.

4.      Cross training employees was very important to Dwight.  I started in the Express area, but everyone was taught how to take an order, work in auxiliary, etc.

5.      While I worked at the BP shop, Dwight would make frequent and regular visits to the shop and also call to check to see that everything was running smoothly.

6.      Dwight always followed through with projects and would check on the status.

7.      After Dwight left Kinkos, Ted would stop by the BP shop once in awhile, but never called to check on how things were going.  He would only call if he wanted to talk about a specific job or if he needed someone to do training.

8.      After Dwight's departure, the BP shop went down fast.  It seemed like nobody cared about the shop.  Jobs were late and done wrong a lot of the time.  It just progressively got worse after Dwight left, and finally got so bad that it was rumored that BP might cancel their contract.

*Affidavit of Joe Poydack* - Page 2 of 4
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246139(8690-1)

EXHIBIT: _C_
Page _2_ of _4_

9.      There were no major problems with the BP shop while Dwight was there.  BP jobs were a priority to Dwight, but the shop was not a priority for the managers who came in after Dwight.

10.      I was trained to use the Jetlite system.  I found it to be a pain and redundant, but it had to be done.  Dwight talked about the Jetlite system at every store meeting.

11.      Dwight held monthly store meetings where we discussed the Jetlite system, how the store was doing, how we could improve, MSM scores, taking orders, etc.

12.      The Northern Lights store was very busy.  It seemed like we could always use more employees.

13.      Dwight knew how to get his employees to work as a team and he would always pitch in when needed and even work the floor when we were short-staffed. Dwight would come in and work a shift if someone called in sick or if they were very busy.

14.      Several employees left Kinkos after Dwight's departure partially due to a lack of supervision.  Ted spent a significant amount of time at the Dimond branch, which is where he preferred to be.  With little or no supervision at the Northern Lights branch, jobs were getting done late and customers were becoming very upset.

15.      The Northern Lights store was usually pretty clean under the management of both Dwight and Ted.

*Affidavit of Joe Poydack* - Page 3 of 4
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246139(8690-1)

EXHIBIT: _C_
Page _3_ of _4_

16.     Dwight and Ted had very different management styles.  Dwight was very personable and friendly.  Ted was not personable and didn't connect with people at the store.

17.     Dwight is friends with everybody.  He was a very competent manager.  He cared about his employees and about the jobs they did.

Further your affiant sayeth naught.

_____
**Joe Poydack**

SUBSCRIBED AND SWORN TO before me this 5th day of May, 2006.

_____
NOTARY PUBLIC in and for Alaska
My Commission Expires: 12/12/09

<u>*Certificate of Service*</u>

I hereby certify that a true and correct copy of the foregoing was ☐ faxed ☐ hand delivered and/or ☐ mailed this ____ day of May 2006 to:

Thomas M. Daniel, Esq.
Perkins Coie LLP
1029 W. 3rd Avenue, Suite 300
Anchorage, AK  99501

_____
**Michelle Martin**

*Affidavit of Joe Poydack* - Page 4 of 4
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246139(8690-1)

James M. Seedorf
Hughes Bauman Pfiffner
 Gorski & Seedorf LLC
3900 C Street, Suite 1001
Anchorage, Alaska 99503
(907) 263-8225

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DWIGHT GREENE,

          Plaintiff,

vs.

FEDEX KINKO'S OFFICE AND PRINT
SERVICES, INC.

          Defendant.

Case No. A04-0160 CV (RRB)

## AFFIDAVIT OF HOLLY POYDACK

STATE OF ALASKA

THIRD JUDICIAL DISTRICT

ss

**HOLLY POYDACK**, being first duly sworn upon oath, deposes and states

as follows:

    1.    I was employed at Kinko's from August 1998 until October 2004.

*Affidavit of Holly Poydack* - Page 1 of 4
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246140(8690-1)

2.      I was employed at the Northern Lights store where I was a Project Manager and also worked the front counter.

3.      I had the opportunity to work under the supervision of both Dwight Greene and Ted Collins.

4.      I enjoyed working for Dwight and Ted, but they had very different management styles. Dwight was very personable and friendly. Ted's management style was strictly professional. He kept his distance from employees and did not appear comfortable talking about anything other than work.

5.      I found Dwight to be a competent manager. He knew what was going on in the store and did a good job. There were several employees who left employment with Kinkos in protest due to Dwight's termination.

6.      Cross training employees was very important to Dwight. During Dwight's tenure at Kinko's I was cross trained to do many other jobs in the store, including ordering supplies. This was particularly helpful because the Northern Lights store was understaffed. I did not receive additional training under Ted's supervision.

7.      Dwight stressed the importance of the Jetlite system to all employees. The system worked really well when everyone did what they were supposed to do. While each person had a role and knew what they were supposed to do with the Jetlite system; when someone would forget to input information because they were very busy, they would either enter the information as soon as they could or if the due time was

*Affidavit of Holly Poydack* - Page 2 of 4
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246140(8690-1)

too close the information would not get entered.  I do not believe you could manipulate the sign off time on projects in the Jetlite system.

8.    The Northern Lights store was busy and understaffed.  It is my recollection that there were approximately 20-25 employees at the store.

9.    Dwight's philosophy was to surround himself with good people and trust them to do their job.  He was a "hands on" manager, but not in a micro-managing way.

10.    Employee morale at store under Dwight's supervision was pretty good and upbeat.  I think this had to do a lot with Dwight's personality of being open and friendly.  Morale declined when Dwight left and mine was definitely lower.

11.    Dwight held monthly store meetings where we discussed the Jetlite system, MSM scores, the budget, profits/losses, equipment, as well as employee concerns and/or opinions.

Further your affiant sayeth naught.

**Holly Poydack**

SUBSCRIBED AND SWORN TO before me this _5_ day of May, 2006.

NOTARY PUBLIC in and for Alaska
My Commission Expires: _with Office_

*Affidavit of Holly Poydack* - Page 3 of 4
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246140(8690-1)

## _Certificate of Service_

I hereby certify that a true and correct copy of the foregoing was ☐ faxed ☐ hand delivered and/or ☐ mailed this _____ day of May 2006 to:

Thomas M. Daniel, Esq.
Perkins Coie LLP
1029 W. 3rd Avenue, Suite 300
Anchorage, AK  99501


_____
**Michelle Martin**

_Affidavit of Holly Poydack_ - Page 4 of 4
_Greene v. FedEx Kinko's,_ Case No. A04-0160 CV
246140(8690-1)

James M. Seedorf
Hughes Bauman Pfiffner
  Gorski & Seedorf LLC
3900 C Street, Suite 1001
Anchorage, Alaska 99503
(907) 263-8225

Attorneys for Plaintiff

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

DWIGHT GREENE,

          Plaintiff,

vs.

FEDEX KINKO'S OFFICE AND PRINT
SERVICES, INC.

          Defendant.

Case No. A04-0160 CV (RRB)

### AFFIDAVIT OF SHEILA HUDMAN

STATE OF ALASKA

THIRD JUDICIAL DISTRICT

ss

      **SHEILA HUDMAN**, being first duly sworn upon oath, deposes and states as follows:

      1.    I was employed at Kinko's from September 2001 until November 2004.

*Affidavit of Sheila Hudman* - Page 1 of 6
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246165(8690-1)

Exhibit *E*
Page *1* of *6*

2.     I worked in Express and customer service under Dwight Greene at the Northern Lights branch.  After six months I became a Project Manager and three months later worked in sales.

3.     Under Dwight's supervision I was cross trained to work all aspects of the store.  Dwight tried to rotate people around so all areas could be covered if someone called in sick.

4.     Dwight would also help out on the floor and personally trained me to operate the Info-print.  When we had big jobs, Dwight would stay late at night and help collate jobs.  He was very involved.  Dwight would help run jobs and deal with customers daily.

5.     I had the opportunity to work at the Dimond store on a couple of occasions while Ted was the manager there.  Nobody talked; it was dark and quiet – just work.

6.     I personally observed Dwight training other co-workers.  He would show the person how to do something and then they would do it together.

7.     Dwight held monthly store meetings where we discussed the Jetlite system, glue system, budget, how the store was doing, how we could improve, MSM scores, taking orders, new machinery, employee opinion input, etc.  We were always competing against a Hawaii store and we would discuss that.

8.     Dwight was supportive of the Jetlite system.   The Project Coordinator was in charge of making sure the employees signed off on their part of jobs.

*Affidavit of Sheila Hudman* - Page 2 of 6
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246165(8690-1)



Dwight was stern to the employees that they needed to learn the Jetlite system and abide by it. It was important that they sign off when they were supposed to. If an employee would forget to sign off on the Jetlite system because we would get so busy, the Project Coordinator would follow-up and ask them to sign off on it.

9.     The Northern Lights store did about three times the volume of the Dimond store. The Jetlite system was much more stressful to Ted at the Northern Lights store because the store was so busy.

10.    To my knowledge, there were never 40 employees at the Northern Lights store. At the maximum under Dwight there may have been 32 employees. Within a three week span after Dwight's termination at least eight employees quit in protest or because they did not like Ted. There was a lot of confusion and turmoil in the store after Dwight left and many employees were not happy working there any longer.

11.    We were always busy at the Northern Lights store and I don't believe we were ever overstaffed.

12.    Ron implemented a hiring freeze at the Northern Lights store and would not allow Dwight to hire anyone.

13.    Some of the machinery at the Northern Lights store was outdated, but Ron Kuhn would not allow for Dwight to replace it.

14.    Dwight was picky about keeping the store clean, and the Northern Lights store was usually kept pretty clean.

*Affidavit of Sheila Hudman* - Page 3 of 6
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246165(8690-1)

15.    Dwight would go to the BP shop at least once or twice a week to check on how things were going.  He was always in contact with the BP staff.

16.    After Dwight there was no management involvement at the BP shop.

17.    Dwight treated employees like they were family, but he would also be firm when he needed to.  There was no favoritism.  A lot of people didn't even know that Dwight's wife worked at the same store.

18.    Dwight Greene was a fair and consistent manager.  He was very nice, but firm.  He was involved with and knowledgeable about the store

19.    I felt like Ron Kuhn showed favoritism towards the Dimond store. Ron would spend a lot of time at the Dimond store, but when he came to the Northern Lights store he would be very strict and firm.

20.    I personally saw Ted Collins come into the Northern Lights store twice, maybe three times, while Dwight was the manager.  He came in to meet with Dwight, not to work in the store.

21.    Everyone at the Northern Lights store was friendly and upbeat while Dwight was there.  Employee morale became very low after Dwight's termination.

22.    Ted Collins promoted me to Assistant Manager of Retail at the Northern Lights store when he became the branch manager.

23.    We were so shorthanded when Ted took over the Northern Lights store that he had to bring over some employees from the Dimond store.

*Affidavit of Sheila Hudman* - Page 4 of 6
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246165(8690-1)



24.    Ted did not want to be at the Northern Lights store.  I would see Ted once or twice a day for a few minutes and that was it.  When he was at the Northern Lights store he would become very stressed.  He spent most of his time at the Dimond store training his replacement.

25.    The other Assistant Managers and I ran the store after Dwight's termination.  When Ted came in his attitude was "do whatever".  The store actually ran better when Ted wasn't there.

26.    Under Ted's supervision, he wanted people in one job; not covering for others.  I found this to be very confusing.

27.    Ted was a good manager, but he was overwhelmed.  He would try to work the front counter, but would get stressed and return to his office.  He didn't have control over the size of the store.

28.    We were all cross trained on ordering.  Brian Roberts would order the paper.  I would help Laurie Greene order the retail supplies.  Laurie would order office supplies.  When Laurie left Kinkos, Onni, a new assistant manager, took over ordering the paper and I took over ordering everything else.

29.    When FedEx took over Kinkos, Ted did not want to learn the new ordering procedure.

*Affidavit of Sheila Hudman* - Page 5 of 6
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246165(8690-1)



Further your affiant sayeth naught.

_____
**Sheila Hudman**

SUBSCRIBED AND SWORN TO before me this _____ day of May, 2006.

_____
NOTARY PUBLIC in and for Alaska
My Commission Expires:_____

_Certificate of Service_

I hereby certify that a true and correct copy of the
foregoing was ☐faxed ☐hand delivered and/or ☐
mailed this _____ day of May 2006 to:

Thomas M. Daniel, Esq.
Perkins Coie LLP
1029 W. 3rd Avenue, Suite 300
Anchorage, AK  99501


_____
**Michelle Martin**

_Affidavit of Sheila Hudman_ - Page 6 of 6
_Greene v. FedEx Kinko's,_ Case No. A04-0160 CV
246165(8690-1)

Exhibit: _E_
Page _6_ of _6_

James M. Seedorf
Hughes Bauman Pfiffner
 Gorski & Seedorf LLC
3900 C Street, Suite 1001
Anchorage, Alaska 99503
(907) 263-8225

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DWIGHT GREENE,

              Plaintiff,

vs.

FEDEX KINKO'S OFFICE AND PRINT
SERVICES, INC.

              Defendant.

Case No. A04-0160 CV (RRB)

**AFFIDAVIT OF DAVE GROH**

STATE OF ALASKA

              ss

THIRD JUDICIAL DISTRICT

      **DAVE GROH**, being first duly sworn upon oath, deposes and states as follows:

      1.    I was employed at Kinko's from June 2002 until September 28, 2004.

*Affidavit of Dave Groh* - Page 1 of 4
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246216(8690-1)

UGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
NCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

Exhibit F
Page 1 of 4

2.      Dwight Greene was the Branch Manager at the Northern Lights store when he hired me as a driver in 2003. I also worked at the Hilton branch when it needed coverage.  I was fully trained on all of the copying equipment.

3.      Dwight was an awesome manager.  He could do everything and run a branch smoothly.

4.      Dwight taught me a lot of lessons that I still use in everyday life, such as dealing with difficult customers.

5.      While I wasn't required to do other duties at the store, I wanted to learn how to operate the machines so that I could help Dwight out.

6.      After Dwight's termination there was no manager at the Northern Lights store for a couple of months.

7.      Dwight would help out working on the floor all of the time.  He wasn't the type of manager to sit in his office.  He was very involved with the store.

8.      I don't believe there were ever 40 employees at the Northern Lights store.  The store was always busy with just enough employees to get the job done.

9.      Dwight held monthly store meetings where we discussed profit/loss, the Jetlite system, job on-time ratio, how the store was doing, MSM scores and how we could improve them, and customer service.

10.      Dwight was very involved with the BP branch.  He would review order tickets and the jobs were almost always completed on time.

Iughes Bauman Pfiffner
Gorski & Seedorf, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
NCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Affidavit of Dave Groh* - Page 2 of 4
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246216(8690-1)

11.    Dwight was very adamant about putting jobs in the Jetlite and this was always discussed at store meetings.

12.    Employee morale was pretty good while Dwight was there.  After his termination morale was quite bad for several weeks.  Dwight brought a happy persona to the store.

13.    Dwight wanted the store kept clean, and had me clean up around the store when I wasn't doing deliveries.  The store looked really clean at the time Ted Collins first became manager because everything was brand new, but the condition now is cluttered and dirty.

14.    Dwight kept a binder where he would track equipment breakdowns. He made sure the equipment was fixed timely and stayed on top of the people at Xerox to get the equipment fixed.

15.    I applied for the Assistant Manager position at the Northern Lights store while Dwight was the Branch Manager.  I was interviewed telephonically by Ron Kuhn.  I did not get the position.

Further your affiant sayeth naught.

_____
**Dave Groh**

SUBSCRIBED AND SWORN TO before me this _8th_ day of May, 2006.

_____
NOTARY PUBLIC in and for Alaska
My Commission Expires: _3-7-08_

HUGHES BAUMAN PFIFFNER
GORSKI & SEEDORF, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Affidavit of Dave Groh* - Page 3 of 4
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246216(8690-1)

## *Certificate of Service*

I hereby certify that a true and correct copy of the foregoing was ☐ faxed ☐ hand delivered and/or ☐ mailed this _____ day of May 2006 to:

Thomas M. Daniel, Esq.
Perkins Coie LLP
1029 W. 3rd Avenue, Suite 300
Anchorage, AK  99501

_____
**Michelle Martin**

Hughes Bauman Pfiffner
Gorski & Seedorf, LLC
ATTORNEYS AT LAW
3900 C STREET
SUITE 1001
ANCHORAGE, ALASKA 99503
(907) 274-7522
(907) 263-8320 FAX

*Affidavit of Dave Groh* - Page 4 of 4
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246216(8690-1)

James M. Seedorf
Hughes Bauman Pfiffner
 Gorski & Seedorf LLC
3900 C Street, Suite 1001
Anchorage, Alaska 99503
(907) 263-8225

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

DWIGHT GREENE,

              Plaintiff,

vs.

FEDEX KINKO'S OFFICE AND PRINT
SERVICES, INC.

              Defendant.

Case No. A04-0160 CV (RRB)

## AFFIDAVIT OF CHRIS KINNEY

STATE OF _TBD_

COUNTY OF _TBD_

ss

**CHRIS KINNEY**, being first duly sworn upon oath, deposes and states as

follows:

    1.    I was employed at Kinko's from November 2000 until early 2004.

*Affidavit of Chris Kinney* - Page 1 of 4
*Greene v. FedEx Kinko's,* Case No. A04-0160 CV
246237(8690-1)

EXHIBIT: 6
Page 1 of 4

2.      Dwight Greene was my supervisor at the Northern Lights store where I was employed to work the front counter and graphic design.

3.      Employee morale was pretty good under Dwight's supervision, and everyone got along pretty well. After Dwight was terminated we were all just shocked. Many of us were disappointed because Dwight had hired us and it was unclear who would now be managing the store.

4.      Dwight held monthly store meetings where we discussed general training, the Jetlite system, job on-time ratio, how the store was doing, MSM scores, how we could improve, and customer service.

5.      We received a lot of cross-training at Kinkos by Dwight and other co-workers. Dwight liked the co-workers to interact with each other and he'd have employees train each other. If you ran production, Dwight wanted you to learn all of the machines. Dwight trained me on running the larger copiers.

6.      Dwight would help out working on the floor all of the time. Dwight would always stay late and help finish up jobs when we were really busy. He would cover for someone when they would call in sick.

7.      Dwight always made sure the equipment was running and being maintained. If there was an equipment breakdown Dwight would make sure that a repairman or technician had been called and would continually follow-up on the status of getting the repairs completed.

*Affidavit of Chris Kinney* - Page 2 of 4
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246237(8690-1)

8.    All of the front counter workers were trained on the Jetlite System. We also had a quality check person on all of the shifts that was trained on the Jetlite system. The quality check table would occasionally stack up with jobs, but we had a person who took care of that and would normally keep it cleared off.

9.    The Northern Lights store was very busy with a lot of customers coming in and out of the store. The store was always clean, but when we were really busy there could be some clutter.

10.    I never perceived there to be a problem with Dwight's wife, Laurie, working at the store. Everything ran smoothly.

11.    Dwight was a hands on and friendly manager. The co-workers really liked him because he was so easy to talk to. I never thought of Dwight as being too personal or friendly with employees because he would stay pretty stern as well.

Further your affiant sayeth naught

_____
**Chris Kinney**

SUBSCRIBED AND SWORN TO before me this 10th day of ~~June~~ May, 2006.

_____
NOTARY PUBLIC in and for Butte County,
My Commission Expires: 01/26/2010    California

HILLARY GIVEN
COMM. #1640790
NOTARY PUBLIC · CALIFORNIA
BUTTE COUNTY
COMM. EXPIRES JAN. 26, 2010

*Affidavit of Chris Kinney* – Page 3 of 4
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246237(8690-1)

## Certificate of Service

I hereby certify that a true and correct copy of the
foregoing was ☐ faxed ☐ hand delivered and/or ☐
mailed this _____ day of June 2006 to:

Thomas M. Daniel, Esq.
Perkins Coie LLP
1029 W. 3rd Avenue, Suite 300
Anchorage, AK 99501

_____
**Michelle Martin**

*Affidavit of Chris Kinney - Page 4 of 4*
*Greene v. FedEx Kinko's*, Case No. A04-0160 CV
246237(8690-1)