IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DWIGHT GREENE,

      Plaintiff,

vs.

FEDEX KINKO'S OFFICE AND PRINT
SERVICES, INC.,

      Defendant.

Case No. 3:04-cv-0160-RRB

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Before the Court is Defendant FedEx Kinko's Office and
Print Services, Inc. (Kinko's) with a Motion for Summary Judgment
(Docket 35). Kinko's argues the Court should grant summary
judgment in its favor because Plaintiff Dwight Greene (Greene)
cannot establish a prima facie case of discrimination and/or
retaliation. Greene opposes at Docket 39 and argues the facts,
when viewed most favorably to Plaintiff, and with inferences in his
favor, clearly show that he: (1) has established a prima facie case
for termination (due to illegal discrimination based on race, age,

and religion, as well as retaliation); and (2) has ample evidence of "pretext."  The Court disagrees.

Because no "factual" issues exist with respect to Counts I, III, and IV of Plaintiff's Complaint, and for additional reasons more carefully articulated herein, Defendant's Motion for Summary Judgment (Docket 35) is hereby **GRANTED**.

## II.  FACTS

Plaintiff Greene began his employment with Defendant Kinko's in approximately May 1990 as an hourly employee.[1]  "He received numerous promotions including, but not limited to, being elevated to Shift Leader, Assistant Manager, General Manager, and finally Senior Branch Manager."[2]  He also "received numerous awards from Kinko's, including but not limited to Store of the Year, 3rd [H]ighest Mature Sales Growth, Top Profit Percentage, and 2nd Highest Core Cost Control."[3]  "In May of 2002, Kinko's congratulated Dwight Greene for 'setting a new all-time record at the Northern Lights Kinko's branch.'"[4]

"In 2000, the same year that Greene became branch manager of the Northern Lights Branch, Kinko's Chief Executive Officer put

---

[1]     Docket 39 at 2.

[2]     Id. (citation omitted).

[3]     Id. (citation omitted).

[4]     Id. (citation omitted).

a renewed focus on quality and customer service."[5]   Indeed, Kinko's

"developed an extensive quality monitoring system to measure

customer satisfaction and then score the various Kinko's

branches."[6]

In or around December 2000, "all of the Alaska stores

were combined with the Hawaii stores in the Hawaii/Alaska district.

The [new] district manager [for the Hawaii/Alaska district] was Ron

Kuhn [(Kuhn)]."[7]   Kuhn was designated as Greene's immediate

supervisor.

Kuhn's first performance review of Greene, dated

February 28, 2001, was "very complimentary of Greene, noting 'VERY

strong' sales growth and 'outstanding performance' regarding the

Northern Lights Branch's costs."[8]   However, Kuhn went on to note

that:

> YTD [year to date][Mission Statement
> Measurement ("MSM")] score was 81.59 and was
> number 644 out of 822.  We will need to
> ratchet that up several notches in 2001.  I
> look forward to your continuing to fine tune

---

[5]     Docket 35 at 3.  Greene became the Branch Manager of the
Northern Lights Kinko's store in Anchorage, Alaska, in May 2000.

[6]     Id. (emphasis added)(citation omitted).

[7]     Id. at 6.

[8]     Id. at 7 (citation omitted).  The February 28, 2001,
evaluation rated Greene's performance from January 1, 2000, to
December 31, 2000.

your operation and in reaping the benefits of doing so.[9]

Greene "remembers that an adequate MSM score was about 90, and admits that his MSM score for 2000 was below Kinko's standards."[10] Greene further "admits that he clearly understood that he was being told to get his MSM scores up and comply with the operations manual."[11]

> However, when Greene was asked if he understood, after receiving his evaluation, that he needed to work on his customer service scores and compliance with the operation manual, Greene responded, "[n]o. I understood that those were two items [Kuhn] wanted me to work on."[12]

In addition, Greene "testified that he did not think the MSM scores accurately reflected customer satisfaction. Instead, he believed that the most important thing was 'the bottom line,' i.e., how much money a store made."[13]

Greene's 2001 performance review, dated March 25, 2002, "again noted that the Northern Lights Branch's MSM scores were

---

[9]   Id. (citation omitted).

[10]  Id. (citation omitted).

[11]  Id. (emphasis added).

[12]  Id. (emphasis added)(citation omitted).

[13]  Id. at 7-8 (citations omitted).

still below standard . . . ."[14]  And, on November, 19, 2002, Greene

was issued a Performance Counseling Statement because his MSM

performance was significantly below company expectations.[15]  "Kuhn

explained that the reasons Greene's MSM scores were down were

systems not being followed and Greene was not hiring good people.

Greene does not dispute that his MSM scores were that low or that

they were below company expectations."[16]

In 2003, i.e., on January 28, 2003, and May 19, 2003, two

separate and distinct assessments revealed Greene's MSM scores were

still "well below Kinko's standards."[17]  Consequently,

> After receiving input and approval from his
> regional vice president, Heather Clark, and
> the human resources representative, Tracy
> Gimbel, Kuhn gave Greene a written reprimand.
> It stated: "We are currently below 65 on our
> MSM scoring so far (5 surveys thus far) for
> the second quarter.  You were on a PCS
> [Performance Counseling Statement] last year
> when your score was below 85."[18]

"In the warning notice, Ron Kuhn went on to explain the

reasons for Greene's poor performance were his failure to have

---

[14]     Id. at 8.  The March 25, 2002, evaluation rated Greene's
performance from January 1, 2001, to December 31, 2001.

[15]     Id. at 9.

[16]     Id. (emphasis added)(citations omitted).

[17]     Id. at 10.

[18]     Id. at 10-11 (citations omitted).

standard operating procedures in place and a poor team of managers

in the store (selected by Greene)."[19]

> Kuhn warned Greene that (1) his MSM scores
> would have to improve to better than 85% by
> the end of the second quarter (June 30, 2003),
> and (2) Greene would have to score better than
> 91% on a [Branch Operating Assessment
> ("BOA")]. Greene testified that Kuhn "made it
> perfectly clear that by the end of June, if I
> had not met the standard, I [would] be gone."[20]

> * * *

> Greene did not meet the first objective set
> forth in this written reprimand – achieving an
> MSM score of 85% by the end of the quarter
> ending June 30, 2003. Greene only achieved a
> score of 81% for the second quarter.  Kuhn,
> his supervisor, Heather Clark, and Tracy
> Gimbel, the regional Human Relations
> representative discussed Greene's situation
> and, according to Kuhn, concluded that Greene
> should be terminated because he had failed to
> achieve one of the two requirements of the
> warning notice.  Kuhn understood that he was
> authorized to terminate Greene on Kuhn's next
> trip to Alaska, which was scheduled for
> July 8, 2003. [Kuhn's] boss, Heather Clark,
> does not recall that a final decision had been
> made to terminate Greene at that point, but
> agrees that they were clearly headed towards
> [sic] termination.[21]

Before the end of the second quarter, i.e., before

June 30, 2003, Greene sent a memorandum to the president of

---

[19]    Id. at 11 (citation omitted).

[20]    Id. at 11 (emphasis added)(citations omitted).

[21]    Id. at 11-12 (emphasis added)(citations and footnotes
omitted).

Kinko's, as well as two vice presidents of the company, alleging that Kuhn was out to get him because of his race (Black) and religion (Christian).

In particular, Greene's memo described the following acts of alleged discriminatory conduct: (1) "Kuhn had written in Greene's 2002 performance appraisal that Greene was a slow learner"[22]; (2) Greene alleged that he "was relating a story to Kuhn about a frustrated customer who said Greene was 'running the business like a monkey,' and Kuhn responded by putting his hands under his arms and making monkey sounds while laughing"[23]; (3) Greene "alleged that Kuhn had reprimanded Greene 'without getting all the facts'"[24]; (4) Greene "complained about a conversation with Kuhn, in which Kuhn said he was 'pissed off' about Greene's lack of communication"[25]; (5) Greene "complained that when he was socializing with Kuhn and other managers, Kuhn was drinking and suggested that they should all go to a strip club"[26]; (6) Greene "complained about an incident where Kuhn had sent an email to every

---

[22]    Id. at 12 (citation omitted).

[23]    Id. at 13 (citation omitted).

[24]    Id. (citation omitted).

[25]    Id. (citation omitted).

[26]    Id. (citation omitted). Greene alleges "KINKO's knew of [his] deep religious beliefs and convictions." Plaintiff's Complaint at 6.

manager in the Alaska/Hawaii District which included a note that Greene and another branch manager had been reprimanded"[27]; (7) Greene "alleged that he should have been sent to a training course for high performing managers"[28]; (8) Greene "complained that Kuhn had given him low scores on a Management Effectiveness Survey"[29]; and (9) Greene "complained that Kuhn had given him the written warning of possible termination."[30]

In the memo,

Greene stated that he was left with no alternative but to submit his complaint to the highest level "in light of the fact that Mr. Kuhn has informed me that he will terminate my employment with Kinko's if I have not met his standards by the end of the June 30, 2003."[31]

The memo made no mention of Plaintiff's MSM scores.

Kuhn had scheduled to visit the Northern Lights Branch <u>before</u> Greene submitted his complaint and Greene was aware of the scheduled visit. The visit occurred on July 8, 2003, only 10 days after the date of Greene's internal complaint (although the record is unclear as to the actual date the complaint was sent by Greene or received by Kinko's). Kuhn was unaware of Greene's

---

[27]    <u>Id.</u> (citation omitted).

[28]    <u>Id.</u> (citation omitted).

[29]    <u>Id.</u> (citation omitted).

[30]    <u>Id.</u> (citation omitted).

[31]    <u>Id.</u> (citation omitted).

complaint because he had not been sent a copy. Shortly before Kuhn arrived in Anchorage, his boss, Heather Clark, informed him that Greene had written a letter to Human Resources complaining about Kuhn. However, Clark did not inform Kuhn that Greene's letter alleged any kind of discrimination. Clark instructed Kuhn to hold up on terminating Greene and to instead treat his visit to the Northern Lights Branch as he would any other visit. As such, when Kuhn arrived in Anchorage, he planned on performing a BEA [Branch Execution Assessment].[32]

When Kuhn arrived in Anchorage and met with Greene, he asked him "whether he wanted to talk about the complaint letter. Greene said that he did not want to discuss it. Kuhn proceeded to perform the BEA."[33]

Clark called Kuhn while Kuhn was at lunch and instructed Kuhn to stop performing the BEA and perform the more extensive BOA instead. Clark informed Kuhn that, because Greene's written reprimand stated that Kuhn would perform a BOA, it would be appropriate to do so. Kuhn proceeded to perform the BOA.[34]

Soon thereafter, Kuhn realized that Greene was not going to pass the BOA and asked Greene to consider other positions in the company. Greene declined to do so and the BOA proceeded. At the

---

[32]    Id. at 14 (emphasis added)(footnote and citations omitted).

[33]    Id. at 14-15 (citations omitted).

[34]    Id. at 15 (citations omitted).

conclusion, "[t]he BOA score was 69.6% - well below the 91% threshold that was required as part of his written reprimand."[35]

Greene "now contends that his low score was retaliatory, but concedes that he was present with Kuhn the entire day, as the BOA was conducted, and cannot point to any item that Kuhn scored incorrectly."[36]

Kinko's investigation team "concluded that there was no basis to conclude that Kuhn had discriminated against Greene on the basis of his race or religious beliefs."[37]   Kinko's did, however, conclude "that Kuhn's management style was perceived 'as militaristic, controlling, manages by intimidation, and when Mr. Kuhn comes to a decision, there is no changing his mind.'"[38] As a result,

> Kinko's temporarily removed Ron Kuhn as Greene's district manager and placed Greene under the supervision of Mike Gadberry, a district manager in Oregon.  During the approximate two-month period that Greene was assigned to a different district manager, his store's MSM scores and quality audits _did_ improve.[39]

---

[35]    _Id._ (citation omitted).

[36]    _Id._ (citations omitted).

[37]    _Id._ at 15-16.

[38]    _Id._ at 16 (citation omitted).

[39]    _Id._ at 17 (emphasis added)(citation omitted).

"On October 13 and 14, 2003, Clark and Kuhn visited the Northern Lights Branch to reengage Kuhn as Greene's supervisor."[40] While they were in Anchorage, Kuhn performed a BEA of the Northern Lights Branch with Clark, his boss, observing. Greene "scored 89.9%, only slightly below Kinko's expectations."[41]

Another BEA was conducted on November 19, 2003, by Mike Gadberry "and resulted in a score of 70.0%, 20 points below the expectation for Kinko's branches."[42] Greene "admits that this score was below Kinko's expectations and does not allege that Gadberry was discriminating or retaliating against him."[43]

Greene's scores continued to worsen.

> In late November and early December 2003, management discussions turned again to terminating Greene. Although Ron Kuhn believed that Greene should have been terminated back in June of 2003 for his failure to meet Kinko's standards, he could not make that decision alone, but instead was required to get approval from Clark before he made any decisions relating to the Northern Lights Branch.[44]

---

[40]    Id. (citation omitted).

[41]    Id. (citation omitted).

[42]    Id. at 18.

[43]    Id. at 18 (emphasis added)(citation omitted).

[44]    Id. at 18-19 (citations omitted).

"Clark decided to terminate Greene in December 2003."[45] However, following a last minute call to the

> Human Resources and Legal Departments, <u>Clark decided to give Greene one more chance. So instead of terminating Greene, Clark gave Greene another written warning (SES) to improve his performance or he would be fired</u>. On December 12, 2003, Tracy Gimbel, the Human Resources manager, traveled to the Northern Lights Branch to inform Greene of the decision.[46]

Greene's performance, i.e., his MSM scores, did not improve. As a result, in January 2004, Clark "made the decision to terminate Greene's employment."[47] "However, Kinko's allowed Greene to stay on until March of 200[4] to ensure that Greene would receive shares of Kinko's stock when Kinko's merged with Federal Express on February 12, 2004."[48]

All the while,

> Kuhn, having grown frustrated with the on-again-off-again termination of Greene, and without the approval of anyone in management, sent an email to Greene, stating that he was withdrawing from supervising Greene. As a consequence of Kuhn's unilateral decision to

---

[45]    <u>Id.</u> at 19 (citation omitted).

[46]    <u>Id.</u> (emphasis added)(citations omitted).

[47]    <u>Id.</u> at 20 (citation omitted).

[48]    <u>Id.</u> (citations omitted).

withdraw from supervising Greene, Kinko's
terminated Kuhn for insubordination.[49]

## III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides
that summary judgment should be granted if there is no genuine
dispute as to material facts and if the moving party is entitled to
judgment as a matter of law.  The moving party has the burden of
showing that there is no genuine dispute as to material fact.[50]  The
moving party need not present evidence; it need only point out the
lack of any genuine dispute as to material fact.[51]  Once the moving
party has met this burden, the nonmoving party must set forth
evidence of specific facts showing the existence of a genuine issue
for trial.[52]  All evidence presented by the non-movant must be
believed for purposes of summary judgment, and all justifiable
inferences must be drawn in favor of the non-movant.[53]  However, the
nonmoving party may not rest upon mere allegations or denials, but
must show that there is sufficient evidence supporting the claimed

---

[49]    Id. at 20-21 (citations omitted).

[50]    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[51]    Id. at 323-325.

[52]    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-9
(1986).

[53]    Id. at 255.

factual dispute to require a fact-finder to resolve the parties'
differing versions of the truth at trial.[54]

## IV.  DISCUSSION

Greene alleges that he was terminated in violation of
Alaska Stat. § 18.80.220,[55] because of: (1) his race (Black); his
age (46); (3) his religion (Christian); and (4) out of retaliation
for filing an internal complaint of discrimination due to his race
and religion.[56]  "The Alaska Supreme Court has adopted a three-part
burden shifting framework (the "pretext" analysis) applied by the
federal courts in Title VII cases when analyzing retaliation and
discrimination cases under [Alaska Stat. § 18.80]."[57]  "Under this
three-part analysis, the plaintiff must first establish a prima
facie case of discrimination to 'eliminate[ ] the most common

---

[54]    Id. at 248-9.

[55]    Alaska Stat. § 18.80.220 lists a variety of unlawful
employment practices to include discrimination against a person
"because of the person's race, religion, color, or national origin,
or because of the person's age, physical or mental disability, sex,
marital status, changes in marital status, or parenthood . . . ."
Alaska Stat. § 18.80.220 (a)(c)(1).

[56]    Docket 35 at 22.  Greene rescinded his age discrimination
claim at oral argument.  Count II, therefore, is **DISMISSED** as moot.

[57]    Id. (citing Era Aviation, Inc. v. Lindfors, 17 P.3d 40,
45-47 (Alaska 2000); VECO, Inc. v. Rosebrock, 970 P.2d 906, 918-19
(Alaska 1999)(endorsing three-part "pretext" test set out in
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and
Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 257
(1981))).

nondiscriminatory reasons for the plaintiff's rejection."[58]    If successful, "the burden of production shifts to the employer to articulate a legitimate, non-retaliatory [and/or nondiscriminatory] explanation for the action . . . ."[59]   "Once that occurs, the burden shifts back to the employee to prove that the employer's stated reason was a pretext for discrimination."[60]   "This test also governs actions for retaliatory discharge."[61]

**A.   Plaintiff Cannot Establish A Prima Face Case For Illegal Discrimination Based On Race Or Religion.**

To establish a _prima_ _facie_ case for illegal discrimination based on race or religion, pursuant to Alaska Stat. § 18.80, and in the discharge context, Greene must establish that: (1) he belongs to a protected class; (2) he was qualified for the job _and_ performing according to the legitimate expectations of the employer; (3) he was terminated from that position; and (4) others, who are not within the protected class, were treated more

---

[58]   _Era Aviation, Inc. v. Lindfors_, 17 P.3d 40, 44 (Alaska 2000)(footnotes omitted).

[59]   _VECO, Inc. v. Rosebrock_, 970 P.2d 906, 919 (Alaska 1999)(_quoting_ _Miller v. Fairchild Industries, Inc._, 797 F.2d 727, 731 (9th Cir. 1986)).

[60]   _Lindfors_, 17 P.3d at 44 (footnote omitted); _McDonnell Douglas Corp. v. Green_, 411 U.S. 792, 804 (1973)(If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination.).

[61]   _VECO_, 970 P.2d at 918 (citation omitted).

favorably.[62]  In accordance with this test, Greene has established

membership in a protected class (Black and Christian), and that he

suffered an adverse employment action, i.e., he was terminated.  He

has not, however, established that he was "performing according to

the legitimate expectations of his employer and there is no

evidence that persons outside the protected class were treated more

favorably."[63]

     Although the record clearly establishes that Greene was

"qualified" for the position of Branch Manager at the Northern

Lights Kinko's store in Anchorage, it further reveals that he "was

not performing up to the expectations of his employer, with regard

to customer service as reflected in the MSM scores."[64]  Indeed,

Greene admits Kinko's had a legitimate right to expect him to get

his MSM and BOA scores up to company expectations, and that "he was

repeatedly warned to improve his scores."[65]  Notwithstanding, and

despite Kinko's best efforts, he failed to do the same.

     Even if Greene were able to establish that he was

performing up to the expectations of Kinko's, he must also:

---

[62]     Docket 35 at 23 (emphasis added)(citing Haroldsen v. Omni
Enterprise, Inc., 901 P.2d 426, 430 (Alaska 1995)).

[63]     Id. at 23-4 (emphasis added).

[64]     Id. at 24 (emphasis added).

[65]     Id., Ex. 1, Greene Dep. at 176.

> [S]how <u>either</u> that similarly situated
> individuals outside [his] protected class were
> treated differently, <u>or</u> "other circumstances
> surrounding the adverse employment action give
> rise to an inference of discrimination."[66]

He has likewise failed to do the same.

In fact, Greene has failed to present any <u>legitimate</u> "comparator" evidence on either his race discrimination or his religious discrimination claims.[67] Moreover, in viewing the evidence presented in the light most favorable to Greene, the Court concludes Greene has <u>not</u> "demonstrated other circumstances surrounding [his] termination that demonstrates a bias or animus against [his race or] religion that give rise to an inference of

---

[66] <u>Bodett v. CoxCom, Inc.</u>, 366 F.3d 736, 744 (9th Cir. 2004)(emphasis in original)(citation omitted).

[67] Arguably, the only "comparator" evidence supplied by Plaintiff is the allegation that he was treated less favorably than the branch manager at the Dimond Branch, Ted Collins. In particular,

> Greene points to allegedly disparate treatment of Collins
> because (1) the Dimond Branch received a new computer
> when it asked for one; (2) Collins did not start work
> until 10 a.m., but Kuhn demanded that Greene be there at
> 8:30 a.m.; and (3) Collins was able to hire assistant
> managers without Kuhn's approval, but Greene was not.

Docket 35 at 35 (<u>citing</u> Ex. 1, Greene Dep. at 77-78, 103-104, 156)(footnote omitted). Notwithstanding the fact that there is a legitimate explanation behind each of Greene's allegations, Greene's "allegations of bias fail because a plaintiff cannot prove discrimination or retaliation by comparing himself to only one other employee." <u>Id.</u> at 36 (<u>citing</u> <u>Sengupta v. Morrison-Knudsen Co., Inc.</u>, 804 F.2d 1072 (9th Cir. 1986)).

discrimination."[68]  Significantly, the Court notes Kuhn supervised nine Kinko's stores in Alaska and Hawaii, of which six were managed by minorities that Kuhn himself had hired.  And, even if Greene could establish a prima facie case of discrimination, which conclusion the Court does not reach herein, "his case fails because he cannot create an issue of fact concerning pretext."[69]

**B.    Kinko's Has Articulated A Legitimate Nondiscriminatory Reason For Its Actions.**

Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory explanation for the action.

> To satisfy this burden, the employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."[70]

Kinko's has clearly "articulated a legitimate nondiscriminatory reason for its decision to terminate Greene - repeated poor performance which did not improve after several warnings,"[71] a number of which were in writing.  Therefore, in order to "defeat

---

[68]    Bodett, 366 F.3d at 744 (citation omitted).

[69]    Docket 35 at 24 (emphasis added).

[70]    VECO, 970 P.2d at 919 (citing Miller v. Fairchild Industries, Inc., 797 F.2d 727, 731 (internal citations and footnote omitted)(9th Cir. 1986)).

[71]    Docket 35 at 24.

summary judgment, Greene must come forward with sufficient evidence to create a genuine issue of fact that Kinko's reason for terminating him was a mere pretext for a discriminatory or retaliatory action."[72]   That is to say, Greene must raise sufficient doubts regarding Kinko's stated justifications to permit a reasonable jury to infer that the reason given is pretextual.  Greene has failed to do so.

**C. Kinko's Reason For Terminating Greene Was Not Pretextual.**

"A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence.  Direct evidence is evidence 'which, if believed proves the fact [of discriminatory animus] without inference or presumption.'"[73] "Because direct evidence is so probative, the plaintiff need offer 'very little' direct evidence to raise a genuine issue of material fact."[74] "Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate discrimination.  It can take two forms.  First, the plaintiff can make an affirmative

---

[72]    Id. at 24-25.

[73]    Coghlan v. American Seafoods Co. LLC., 413 F.3d 1090, 1094-95 (9th Cir. 2005)(citations omitted).

[74]    Id. at 1095 (citation omitted).

case that the employer is biased."[75]  "Second, the plaintiff can
make his case negatively, by showing that the employer's proffered
explanation for the adverse explanation for the adverse action is
'unworthy of credence.'"[76]  But when the plaintiff relies on
circumstantial evidence, "that evidence must be 'specific and
substantial' to defeat the employer's motion for summary
judgment."[77]

Greene does <u>not</u> offer any direct evidence of Kinko's
alleged discriminatory intent.  Because his case is, therefore,
entirely circumstantial, he must present "'specific and
substantial' evidence of <u>intentional discrimination</u> to defeat
[Defendant's Motion for Summary Judgment]."[78]

Greene offers various facts to show that Kinko's reason
for terminating him was pretextual.  In particular, he references:
(1) Kuhn's "monkey mimicry"; (2) Kuhn's describing Greene as a
"slow learner"; (3) "Kuhn's act in sending an e-mail containing a
negative personal performance evaluation (SES performance status)

---

[75]     <u>Id.</u>

[76]     Id. (<u>citing</u> <u>Texas Dept. of Community Affairs v. Burdine</u>,
450 U.S. 248, 256 (1981)).

[77]     <u>Id.</u> (footnote and citation omitted).

[78]     <u>Id.</u> at 1096 (emphasis added)(citation omitted).

to other branch managers . . ."[79] by mistake; (4) Kuhn's invitation
to Greene to:

> "[A]ttend a drinking party at Mr. Kuhn's house
> in Hawaii, participate in a drinking and
> gambling game in Hawaii, attend a strip club
> in Fairbanks, and attend other Kinko's events
> that involved alcohol, swearing or other
> offensive language"[80];

and (5) Kuhn's "directing [P]laintiff to remove from his office a
photo depicting Martin Luther King speaking at the Lincoln
Memorial in Washington D.C. and a poster containing a list of
Hebrew names for God from the Old Testament."[81]

    Taken as a whole, the Court concludes these facts do _not_
raise any genuine issues of material fact to rebut Kinko's
nondiscriminatory reason for terminating Greene's employment.  At
most, some of these facts suggest that Kuhn did not like or get
along with Greene, while others suggest Greene may have been
placed in uncomfortable or embarrassing situations.  This,
however, does not constitute unlawful discrimination.

    Because Greene failed to offer any other evidence of
animus toward his race or religious beliefs as the true motivation
for his termination, or that Kinko's proffered reason for

---

[79]    Docket 39 at 9 (citation omitted).

[80]    _Id._ at 12 (citation omitted).

[81]    _Id._ at 11 (citations omitted).

termination was false, the Court concludes he has failed to raise a genuine issue of material fact as to whether the reason Kinko's gave for terminating him was a pretext for discrimination.[82] Consequently, under the burden shifting framework utilized herein, summary judgment in favor of Kinko's is, therefore, appropriate on Claims I and III of Greene's Complaint.[83]  Greene's retaliation claim fares no better.

> **D.   Greene Cannot Establish A Prima Facie Case Of Retaliation.**
>
>     To establish a prima facie case for retaliation in violation of [Alaska Stat. § 18.80], a plaintiff must establish that "(1) the complainant engaged in a protected activity (e.g., opposed a discriminatory practice); (2) the complainant suffered an adverse employment action; and (3)

---

[82]    Bodett, 366 F.3d at 746.  In an attempt to prove that Kinko's reason for his termination – that he failed to satisfy Kinko's legitimate expectations for job performance – is "unworthy of credence," Greene has also provided the Court with a Supplementation of the Record in Opposition to Defendant's Motion for Summary Judgement (Docket 49).  Greene's additional attempt to persuade the Court, however, is futile.  To begin, each of the affidavits provided are from individuals who were supervised by Greene.  Not only are said affidavits subject to bias, they bare no relevance with regard to Greene's MSM scores, scores which were derived from the customer service, or lack thereof, likely derived during their employment.  Consequently, for this reason, and for additional reasons provided in Kinko's Motion for Summary Judgment (Docket 35), the Court concludes Kinko's rationale for terminating Greene is "worthy of credence."

[83]    Id. (citation omitted).

there was a causal link between the protected
activity and the employer's action."[84]

Kinko's concedes that Greene engaged in a protected
activity and that Greene suffered an adverse employment action.
It argues, however, that there was no causal link between the
protected activity and the employer's action.  The Court agrees.
Because Greene cannot establish the requisite causal link, his
claim for retaliation fails as a matter of law.

"The evidence [clearly] shows that Kinko's was on the
verge of terminating Greene before it had any knowledge of
Greene's discrimination complaint."[85]  Moreover, the Court notes
Kinko's "held up on its termination decision to investigate
Greene's charges against Ron Kuhn and to carefully address his
performance."[86]  In essence, Greene's discrimination complaint
staved off his pending termination and ultimately enabled him to
seek stock options before a pending merger.  It was not, however,
the cause of his termination.  His failure to meet the established
MSM scores and/or standards was.

---

[84]    Docket 35 at 40 (quoting Raad v. Alaska State Com'n for
Human Rights, 86 P.3d 899, 905 (Alaska 2004)).

[85]    Id. at 42.

[86]    Id.

**IV.    CONCLUSION**

Based upon the aforesaid reasons, the Court concludes no issues of fact remain as to Counts I and III of Plaintiff's Complaint, i.e., Plaintiff's race and religious discrimination claims.  Consequently, summary judgment is hereby **GRANTED** with respect to the same.  The Court further concludes Plaintiff has failed to proffer any sufficient evidence to support his retaliation claim; whereby, Count IV of Plaintiff's Complaint fails as a matter of law.

ENTERED this 17th day of May, 2006.

/s/ RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE